### UNITED STATES v. LEATHERS et al.
### No. 188.

Circuit Court of Appeals, Second Circuit.

May 5, 1943.

---

[2] § 1, 54 Stat. 885, 50 U.S.C.A. Appendix § 301.

508

Sydney L. Bleicher, of New York City (Harold L. Fisher, of New York City, of counsel), for appellant Alfred C. Leathers.

Jac M. Wolff, of New York City, and B. D. Oliensis, of Philadelphia, Pa. (B. D. Oliensis, of Philadelphia, Pa., of counsel), for appellant Willard J. Thomas.

Mathias F. Correa, U.S. Atty., of New York City (Saul S. Sharison and Peter J. Donoghue, Asst. U.S. Attys., both of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The defendants Leathers and Thomas were convicted of devising a scheme to defraud a seventy-two year old woman, Johanna A. Bayer, and her nephew, Wilhelm Bayer, through false representations and of executing the scheme through the use of the United States mails. They were also convicted of conspiring to commit the substantive offenses. The defendants Leathers and Thomas have appealed from the judgment of conviction, which, in our opinion, should be affirmed.

Two other defendants, Samuel J. Mustain and David Stewart, were joined with the appellants. Mustain pleaded guilty and testified as a government witness, and Stewart, though convicted, abandoned an appeal which he had taken and commenced the service of his sentence.

The indictment contained four counts; the first three related to the substantive offenses, and the fourth to the conspiracy.

The three substantive counts alleged that on the first day of January, 1939, and continuously thereafter, the appellants and others named in the indictment devised a scheme to defraud Johanna A. Bayer, Wilhelm Bayer, and divers other persons "by inducing and attempting to induce said victims by false representations, pretenses and promises, and fraudulent artifices and devices to part with their money and property in the purchase of" certain oil and gas leases and certain shares of stock. Count 1 set forth the false representations and charged that "for the purpose of executing said scheme" and on the 7th day of January, 1939, the defendants, at the Southern District of New York, "caused to be delivered by the Post Office Establishment of the United States, according to the directions contained thereon, a certain writing, to wit, a cash letter from the Illinois National Bank, Springfield, Illinois, dated January 5, 1939", enclosing among others, "in a postpaid envelope," a check drawn on the Chemical Bank and Trust Company in the sum of $2,000, dated January 3, 1939, payable to Johanna A. Bayer, and drawn by the Central Savings Bank in the City of New York; a check drawn on the Chase National Bank in the sum of $2,000, dated January 3, 1939, payable to Johanna A. Bayer, drawn by the Seamen's Bank for Savings; a check drawn on the Chase National Bank in the sum of $1,920, dated January 3, 1939, payable to Johanna A. Bayer, and drawn by the Union Dime Savings Bank; and a check drawn on the Irving Trust Company in the amount of $1,000, dated January 3, 1939, payable to Johanna A. Bayer, and drawn by the East River Savings Bank. It was alleged that the cash letter was addressed to "First National Bank of New York, 2 Wall Street, New York City."

Count 2 realleged the scheme to defraud and charged that for the purpose of executing the same and on July 17, 1939, the defendants caused to be delivered at the Southern District of New York by the Post Office Establishment "a cash letter" enclosing certain checks in a postpaid envelope, addressed to Guaranty Trust Company, New York City, N. Y., among others

a check drawn to the Guaranty Trust Company of New York in the sum of $625, dated July 13, 1939, payable to self, signed by Johanna A. Bayer.

The third count was identical with the second count except that it alleged that July 24, 1939, was the date upon which the count letter was caused to be delivered by the Post Office to the addressee, Guaranty Trust Company.

The fourth count charged that the defendants conspired to commit the frauds set forth in the first count through the use of the mails.

The appellant Leathers raises no question as to the sufficiency of the proof that he was engaged in a scheme to defraud Miss Bayer and her nephew, or was engaged in the alleged conspiracy, and rests his appeal only upon a supposed lack of proof that the mails were used in the execution of the scheme, and upon errors in the charge of the judge. It is, therefore, unnecessary to outline the details of the fraudulent representations proved at the trial.

The cash letter mentioned in Count 1 was a collection letter sent by the Illinois National Bank of Springfield to the First National Bank of New York, containing many checks for collection, including the five checks set forth in Count 1 aggregating $6,920 which were obtained from Miss Bayer by fraudulent misrepresentations and given by her to the defendant White, who transmitted them to Leathers at Springfield, Illinois. The letters mentioned in Counts 2 and 3 were collection letters sent by the First National Bank of Springfield, Illinois, to the Guaranty Trust Company of New York on two different dates, each containing a check for $625 drawn by Miss Bayer and given by her to one Rockwood, a drilling operator, at the instance of Leathers, to forward the defendants' fraudulent schemes. Payment was stopped by Miss Bayer on the check for $625 delivered on July 17, 1939, but the same check was returned to the Guaranty Trust Company on July 24, 1939, and paid in due course.

Pfeffer, the bank cashier of the Warren-Boynton Bank at New Berlin, Illinois, who had been given the five checks described in Count 1 by Leathers for collection, deposited them in the Illinois Bank of Springfield. McGuar, the auditor of the latter bank, testified that the cash letter enclosing the five checks was prepared at his bank for transmittal to its correspondent, First National Bank of New York. He was asked:

"Q. How did you send these records to the First National Bank in New York City? A. They are sent by mail.

"Q. I show you Government's Exhibits 8A, B, C, D and E, Mr. McGuar, and ask you whether or not you can tell us if those are checks which were sent in this other exhibit for identification which you have in your hand? A. Yes, sir, they are."

No objection was made to the foregoing testimony of McGuar.

Hubbel, auditor of the First National Bank of New York, testified that the cash letter (Exh. 45) and the enclosed checks were received by his bank and that in the ordinary course of business cash letters from the Illinois National Bank were received by mail. Exhibit 45, first marked for identification, was thereafter offered in evidence by the government and received without objection by any of the defendants. The envelope contained the five checks listed in the first count of the indictment and also a sixth check (Exh. 8E) in the sum of $1,000, drawn on the Irving Trust Company by the Bowery Savings Bank, dated January 3, 1939, and payable to Johanna A. Bayer. This check, like the five listed in the first count, was received and collected through the First National Bank of New York. These six checks and the envelope which contained them bore the receipt stamp of the First National Bank of New York which Mr. Hubbel said was affixed in the ordinary course of business upon their receipt by his bank.

Rhatigan, a clerk of the Guaranty Trust Company, testified that the cash letters set forth in the second and third counts of the indictment were received by his bank and given office stamps in the ordinary course of business which in the present instance showed that they were received by air mail July 17, 1939, and July 24, 1939, respectively. He also testified that the cash letters and checks were received by air mail. The offer of these exhibits was objected to on behalf of the defendants but only on the ground that they were immaterial and not connected with the defendants.

Rhatigan further testified as to these exhibits:

"Q. I refer you again to Exhibits 49 and 50 in evidence and ask you to tell us when

those papers were received at your bank and what they refer to? A. Exhibit No. 49 was received by us on July 17, 1939. Exhibit 50 was received on July 24, 1939. They are what are known as collection letters, when they enclose a check for collection.

"Q. Is the check referred to in your letter a check on the Guaranty Trust Company of New York in the amount of $625, signed by Johanna A. Bayer? Is that the check? A. That is the check, yes."

■ It is not disputed that all of the checks we have described in detail were presented for collection to the respective banks in Springfield, Illinois, or that these checks and the collection letters were received by the New York banks to which the cash letters were forwarded. As already stated the question raised on the merits is only whether adequate proof was made that the mails were used to transmit the cash letters and checks. The answer to this contention seems clear. Everyone knows that checks sent by banks from distant parts of the country are almost invariably forwarded by mail. Here officials of both the sending and receiving banks testified without objection that the cash letter and checks mentioned in Count 1 were sent by mail. This would ordinarily be sufficient proof of mailing and receipt. But if it be said that the later testimony of the witnesses showed that they did not have a visual knowledge of these facts, yet their evidence is amply sustained by all the surrounding circumstances. These circumstances are not only the antecedent probability that such transmissions were by mail, but also the testimony of the witnesses that in the ordinary course of business cash letters from the Illinois National Bank to the First National Bank of New York were sent and received by mail. To treat such circumstances, which any reasonable man would rely upon in his business, as having less probative effect than the professed recollection given long' after the, event by some mailing clerk seems entirely unreasonable.

In Knickerbocker Life Ins. Co. v. Pendleton, 115 U.S. 339, 6 S.Ct. 74, 29 L.Ed. 432, the issue was whether a draft had been presented for payment on time. There was some direct evidence that it had been so presented and this was fortified by the testimony of the cashier of a collecting bank that it was presented "as in all similar cases of paper sent to us for collection, which is the custom on the part of the Louisiana National Bank." He admitted that he did not have personal knowledge of this but inferred it because "the rules of the bank make it necessary, in the ordinary course of business, to present both for acceptance and payment." Objections were made to the answers of the cashier relating to the custom of the bank regarding presentment of paper for acceptance and payment, but were overruled. Mr. Justice Bradley, speaking for a unanimous court, said: "The public character of the business of a bank, the strict regulations under which its business is usually transacted, the care required of its officers and agents in performing their duties, bring the case fully within the operation of the rule which allows usage and the course of business to be shown for the purpose of raising a prima facie presumption of fact in aid of collateral testimony. We have no hesitation in holding that the evidence offered was competent to corroborate the testimony of the cashier." 115 U.S. at 347, 6 S.Ct. at page 78, 29 L.Ed. 432.

■ The mailing of the checks set forth in Counts 2 and 3, which were forwarded from the First National Bank of Springfield to the Guaranty Trust Company of New York, was proved by even stronger evidence than the mailing of the checks of Count 1 for the former had an air mail stamp shown to have been affixed by the Trust Company in the regular course of business to letters received by air mail. We hold that the introduction of this stamp was warranted both as part of the proof of ordinary business practice and as a record made in the ordinary course of business —admissible both at common law under the doctrine announced in Massachusetts Bonding & Insurance Co. v. Norwich Pharmacal Co., 2 cir., 18 F.2d 934, and likewise admissible by statute under 28 U.S.C.A. § 695. This section provides that: "any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of said act, transaction, occurrence, or event, if it shall appear that it was made in the regular course of any business, and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the en-

trant or maker, may be shown to affect its weight, but they shall not affect its admissibility."

█ The appellant Thomas argues that the records in question would not be admissible under the early common law rules and that the recent judicial and statutory changes we have referred to are in contravention of the Sixth Amendment. But statements by relatives as to pedigree, declarations against interest, and most important of all in criminal trials, dying declarations, have long been recognized as admissible. It is not necessary to say what limits the Sixth Amendment may set to the extension of exceptions to the rule against hearsay. Probably the permissible extension is a question of degree. We think that business records kept as a matter of ordinary routine are often likely to be more reliable than dying declarations. It cannot be reasonably argued that the extension of the common law book entry rule which we discussed in Massachusetts Bonding & Ins. Co. v. Norwich Pharmacal Co., supra, or the statute cited above, involve any violation of the Sixth Amendment.

Our decision in United States v. Baker, 2 cir., 50 F.2d 122, is said to preclude such proof of mailing as was submitted in the case at bar. But that decision was by a divided court and was prior to the enactment of 28 U.S.C.A. § 695. Moreover, there was testimony in that case that the letters might have been delivered by hand and as to only one of the letters was there testimony that in the ordinary course of business it would come "through the mail." Thus the decision enunciated no definite rule as to proof of mailing but only held that the mailing of one of the letters was insufficiently proved where the sender had said it might have been delivered by hand. In Mackett v. United States, 90 F.2d 462, the Seventh Circuit held that the proof of mailing was insufficient. The evidence there only differed from that in United States v. Baker, 2 cir., 50 F.2d 122, in that there was no testimony in Mackett v. United States that the letters might have been delivered by hand. But even if it be thought that these decisions tend to weaken our conclusion as to proof of mailing, the business entry statute of 1936, enacted since United States v. Baker was decided, justified the ruling of the court below.

█ The appellant Thomas argues that the proof that he had any knowledge of the frauds of his co-defendants, or knowingly participated in them, was entirely insufficient. That his co-defendants were engaged in a fraudulent enterprise is not questioned. In November or December, 1938, Thomas and the defendant White visited Miss Bayer at her home in Garden City, Long Island, but were unable to see her. Shortly after this call they called again, saw her and proposed that she exchange certain trust certificates, which she owned, for oil leases, and told her that they knew a dealer in oil lands in Springfield, Illinois, who was coming to New York, and that they would introduce her to him. On December 20, they took her and her nephew to the Hotel Astor in New York, where she met Leathers. Leathers assured her that he had "proven oil lands" in Illinois, that he was going to dig a well there, and would pay her on her investment 3% for the first three months and 6% every three months thereafter. He asked her to go to Springfield and gave her a check for $75 for her expenses. On December 28th White and Thomas called on her at the Hotel Martinque in New York, drove her to the New York Central Terminal and White accompanied her by rail to Springfield. On December 28, 29 and 30, Thomas, who was in New York, communicated by telephone with White and Leathers in Springfield. Leathers, at the time of Miss Bayer's visit to Springfield, assured her of the safety of her proposed investment in Springfield oil leases. She there entered into a contract to purchase Springfield oil leases for $50,700 and turned over $5,900 of her diversified trust certificates in part payment. On her return to New York White and Thomas again called on her, and at the room of Thomas in the Martinique she turned over to White for Leathers $6,000 more in certificates and checks aggregating $7,920 which we listed in dicussing the proof of the use of the mails. The oil leases Miss Bayer received were on lands containing no oil, yet further attempts were made by White, Thomas and Leathers to extract money from her and, as late as April 26, 1939, and June 7, 1939, they asked her for $1500 to drill a well. On April 20, Thomas and Leathers telephoned her to come to Philadelphia, but she declined, and also declined to pay $1,500 for drilling the well. It is reasonable to suppose that Thomas was unlikely to have been in such close cooperation with the other defendants without knowing what they were about and participating in their schemes. In any

512

event his knowledge and participation were questions properly for the jury and there can be no merit in the contention that a verdict should have been directed for the appellant Thomas.

We have examined the refusals to charge which the appellants criticize. We hold that the instructions adequately covered the case and protected their rights.

The judgment is accordingly affirmed.