**UNITED STATES of America,
Appellee,**

v.

**Satiris G. FASSOULIS, Appellant.**

**No. 450, Docket 35479.**

United States Court of Appeals, Second Circuit.

Argued Feb. 11, 1971.

Decided June 18, 1971.

Certiorari Denied Oct. 12, 1971. See 92 S.Ct. 110.

Edward M. Shaw and Howard Wilson, Asst. U. S. Attys., and Whitney North Seymour, Jr., U. S. Atty., for appellee.

William T. Griffin, Peter D. Griffin and James J. Doyle, New York City, for appellant.

Before FRIENDLY, Chief Judge, WATERMAN, Circuit Judge, and Mc-LEAN, District Judge.*

WATERMAN, Circuit Judge:

Satiris G. Fassoulis, three other individuals, and three corporations were charged in a seventeen count indictment filed on September 3, 1969, with one count charging, in violation of 18 U.S.C. § 371, conspiracy to use, and with sixteen counts alleging specific substantive acts of using, the mails in furtherance of a scheme to defraud in violation of 18 U.S.C. §§ 1341 and 2.[1]  Prior to trial co-

---

\* Of the Southern District of New York, sitting by designation.

1.  § 1341 provides:
   § 1341. Frauds and swindles
   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such

defendants Rafsky, Reifler, Ryan, AIC Corporation and Intercoastal Investors Company, Ltd. entered guilty pleas to one or more counts; charges as to codefendant Community National Life Insurance Company were severed. Fassoulis was tried alone before Judge Tyler and a jury. He did not take the stand and offered no evidence in his own behalf.

From evidence presented by the Government the jury could reasonably have found that during April and May, 1968, appellant, founder of AIC Corporation (hereinafter "AIC"), accompanied by codefendants Rafsky and Reifler, officers of AIC and co-founders of Intercoastal Investors Company, Ltd. (hereinafter "Intercoastal"),[2] traveled to Tulsa, Oklahoma from their New York offices where they met with codefendant Ryan, President of codefendant Community National Life Insurance Company (hereinafter "Community National") in order to have their companies, AIC and Intercoastal, purchase insurance policies on their lives. A series of transactions were consummated. No cash was paid to Community National and no premium on any policy was paid to or accepted by Community National, but in return for the delivery of 750,000 shares of common stock in Tintair, Inc., recently acquired by AIC,[3] sixty-four single premium insurance policies reciting that they were fully paid for were issued to AIC on the lives of appellants, Rafsky and Reifler.

Crucial to the implementation of the scheme the three men planned to put into operation were the policies' stated cash surrender values which approximated $2.6 million. Although it was clearly understood that the stated surrender rights in the policies could not be utilized in any way unless and until premiums had been fully paid, Ryan nevertheless assured Fassoulis that this agreed upon and understood limitation on the cash surrender rights would not be disclosed to anyone, even if some of the policies were assigned as collateral by AIC for bank loans, unless a lender specifically asked about the cash values. The likelihood of such a request was minimal for no notation was made on the face of the policies to modify the printed language contained therein stating that AIC, as owner, had the right to surrender the policies and obtain a substantial cash payment from Community National within six months.[4] Armed with these unaltered policies which they offered as collateral, Fassoulis, Rafsky and Reifler approached seventeen banks for loans on behalf of AIC; and they successfully obtained from eight of the banks loans in excess of $669,000 before this and other frauds were discovered.

The Government's evidence, insofar as it is relevant to this appeal, established that Fassoulis, Rafsky and Reifler borrowed money from the Cleveland Trust Company and the Long Island Trust

---

counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

2. Intercoastal was founded by Rafsky and Reifler in January, 1968. It shared office space with AIC.

3. AIC acquired Tintair at an agreed price of one dollar per share by an agreement entered into in April, 1968. In all, AIC acquired one million shares of Tintair. Payment for the stock, however, was never tendered.

4. "The Owner of this Policy may surrender it at any time for its cash value less any indebtedness to the Company hereon. The cash value of this Policy on its Date of Issue after the premium herefor has been paid shall be $644.74 per $1000 of Face Amount." The provision then calculates the cash surrender value into the future; for example, after twenty years the surrender value is $1056.73 per $1000.

Company without informing the lending officers that AIC had no immediate right to the cash surrender value. Further, in responding to questionnaires from Bankers Trust Company (New York), the Bank of the Commonwealth (Detroit), and the Cleveland Trust Company, Ryan concealed the restriction upon the negotiability of AIC's cash surrender rights.

From AIC's inception,[5] Fassoulis represented that one of AIC's vice presidents was a "Leonard Case," a former associate of J. H. Whitney and a Director of United Artists Corporation. Fassoulis, Rafsky and Reifler signed "Case's" name to AIC documents. In July 1968, Fassoulis presented himself as "Case" to an officer of the Cleveland Trust Company, signed that name to a loan note, and sat by while Rafsky explained that Fassoulis was AIC's foreign contact. The Government's evidence also tended to prove that Fassoulis impersonated "Case" during negotiations with the First Pennsylvania Bank & Trust Company.

While applying for a loan from the Cleveland National Bank, Rafsky, in Fassoulis's presence, told a bank officer that the insurance policies had been acquired in connection with a West Coast real estate transaction, and the officer was also told that AIC had purchased a broom factory in Ecuador and would be importing brooms into Cleveland via the St. Lawrence Seaway.[6] Both of these statements were false.

Finally, in connection with a loan application to the United California Bank, it was conceded at trial that AIC's balance sheet carried a fictitious double entry concerning the real estate transaction mentioned above.

Counts Three, Thirteen, Fourteen, and Seventeen, all with reference to the attempted swindle of the Chase Manhattan Bank and the First Pennsylvania Bank & Trust Company, were dismissed at the close of the Government's case. The jury returned guilty verdicts on the conspiracy count (Count One) and on the remaining twelve substantive counts. Subsequently Judge Tyler set aside the verdicts on eight of these twelve, Counts Two, Four, Six, Seven, Nine, Ten, Eleven and Fifteen, for lack of proof of use of the mails. Appellant was sentenced to concurrent terms of four and one-half years on Count One, and on each of the four remaining substantive counts, Counts Five, Eight, Twelve and Sixteen,[7] but is presently enlarged on bail pending determination of this appeal.

### THE SUBSTANTIVE COUNTS

Each of the substantive counts upon which a judgment of conviction has been entered is premised on a letter from AIC to Robert Dean, a loan officer of the First Pennsylvania Bank & Trust Company, signed by "Leonard Case." Use of the mails is the "gist or corpus" of the offense charged. Mackett v. United States, 90 F.2d 462, 464 (7 Cir. 1937). Whether the Government's proof of use of the mails was sufficient to permit jury consideration of this basic issue is the preliminary question which we must first determine.

There is no doubt that the letters were typed in AIC's New York headquarters. Nor is it challenged that they were received in Philadelphia by Dean. No direct evidence was introduced at trial that they were mailed in New York, but the Government's Exhibit, the

---

5. AIC was not incorporated until July 1, 1968. The prosecution charged that Fassoulis had passed off AIC as an existing corporation before that date in furtherance of his fraudulent scheme.

6. AIC's Treasurer, a part-time employee (who was not indicted), testified that AIC's only connection with the broom

business was that he ordered three sample brooms from Ecuador in June, 1968, and twelve more in the fall.

7. Count One is the conspiracy count. Counts Five, Eight, Twelve, and Sixteen involve attempts to perpetrate the fraud by obtaining loans from the First Pennsylvania Bank & Trust Company.

Count Eight letter, was marked "Special Delivery," and the envelope front attached to the letter had a private postage meter mark showing New York as the place of mailing. The letters underlying the remaining three substantive counts showed AIC's New York office as the mailer's address but no envelopes were introduced at trial to substantiate the assertion that they were mailed in New York. Dean testified that he received all four letters "as mailings," but the Government did not follow this up by introducing into evidence any testimony relative to the general practice of the bank, or of its customs, usages or practices with reference to incoming correspondence, see Stevens v. United States, 306 F.2d 834, 835 (5 Cir. 1962).

■■ Appellant has seized upon this failure of direct proof of appellant's use of the mails; but the absence of direct proof is not fatal to the Government's case, for "The use of the mails may be established, like most other facts, by circumstantial evidence." Stevens v. United States, *supra* at 836. In United States v. Leathers, 135 F.2d 507 (2 Cir. 1943), our earlier case of United States v. Baker, 50 F.2d 122 (2 Cir. 1931), was distinguished on the ground that in *Baker* testimony had been received indicating that the letters there involved might have been delivered by hand and, because no direct proof of mailing was offered, this made indirect proof insufficient because "the circumstances proved [did not] exclude all reasonable doubt" that the mails were in fact used. 50 F. 2d at 123. However, here, as in *Leathers*, there is no reasonable doubt. The testimony of AIC's secretary that she typed the letters in New York, Dean's receipt of them in Philadelphia, the scheme for applying for loans all over the country, all lead to the credible inference that the letters involved here went through the mails. Viewing the evidence as a whole, submission of the case to the jury was proper and the jury could reasonably have concluded that the letters were mailed from New York.[8]

■ Contrary to appellant's assertion, Dean's recollection of a telephone call he had in June or July, 1968, with "Leonard Case" did not violate appellant's Sixth Amendment right to confront the witnesses against him. The purpose of this testimony was to prove that the "Leonard Case" who spoke over the telephone to Dean was really the appellant. Dean was unable to identify the voice as that of Fassoulis, but "the requirement of direct recognition of the voice is not, however, an inexorable or mechanical rule. Circumstantial evidence may be sufficient to identify the speaker." United States v. LoBue, 180 F.Supp. 955, 956 (S.D.N.Y.1960), affirmed, United States v. Agueci, 310 F. 2d 817 (2 Cir. 1962). Here the circumstantial evidence was, indeed, sufficient. Rafsky testified that he was present in New York when Fassoulis spoke on the telephone with someone at the Philadelphia Bank and that after the conversation had been concluded Fassoulis told him that any letters from Dean addressed to "Leonard Case" were to be delivered to Fassoulis. The letters which Dean received signed by "Leonard Case" were typed at Fassoulis's direction. Furthermore, Sanders, AIC's Treasurer, testified that he heard Fassoulis represent himself as "Case" over the telephone. The aggregate of circumstances thus developed make it "extremely remote or highly improbable that anyone other than the defendant was the declarant." *Id.* at 956; see Van Riper v. United States, 13 F.2d 961 (2 Cir. 1926); Jarvis v. United States, 90 F.2d 243 (1 Cir.), cert. denied, 302 U.S. 705, 58 S.Ct. 25, 82 L.Ed. 544 (1937). We have no difficulty in holding that here there was no constitutional deprivation.

■ Appellant claims that the court's remarks contained in the charge to the

---

8. The evidence was sufficient to indicate that the letters were mailed in the Southern District of New York. That is all the venue statute, 18 U.S.C. § 3237(a), requires. United States v. Cashin, 281 F.2d 669 (2 Cir. 1960).

jury concerning Fassoulis's failure to testify were violative of appellant's Fifth Amendment right to exercise his privilege against self-incrimination by not testifying in his own behalf. These remarks are set forth in the margin.[9] We find nothing unfair or inaccurate in them. Cf. United States v. Garguilo, 310 F.2d 249, 252 (2 Cir. 1962).[10]

## THE CONSPIRACY COUNT

The conspiracy count alleged ten overt acts, two of which, Acts Seven and Nine, set forth that Rafsky had mailed letters to the Cleveland Trust Company and the Long Island Trust Company in furtherance of the scheme to defraud. These acts were later alleged in the indictment as substantive Counts Four, Six, Ten and Fifteen. In charging the jury on the law, Judge Tyler emphasized that proof of any one of the overt acts would be sufficient to support a guilty verdict on the conspiracy count. The jury returned guilty verdicts on the conspiracy count and on each of the four related substantive counts. However, after the verdicts had been returned Judge Tyler then set aside the verdicts returned on the four substantive counts for failure of proof of use of the mails. In view of this act by the trial judge appellant maintains that, inasmuch as the jury might have found appellant guilty of conspiracy upon the facts alleged in the substantive counts found not to have been proven, he was placed in jeopardy twice, thus violating the Fifth Amendment,[11] and that his conviction upon Count One, the conspiracy count, was unconstitutionally obtained.

We note initially that, as a general rule, an acquittal on a substantive charge does not prevent a conviction for a conspiracy to commit the offense substantively charged unless the necessary proof on the substantive charge is identical with that required to convict on the conspiracy count. Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954). The Fifth Circuit has noted an exception to this general rule and it is this exception which appellant argues is determinative here. In Yawn v. United States, 244 F.2d 235 (5 Cir. 1957), the appellant, who had been acquitted by a jury of possession of an illegal still, was subsequently convicted of conspiracy to violate the liquor laws, one of the overt acts in furtherance of the conspiracy being the possession of this same still. The conspiracy conviction was reversed for a new trial in which evidence concerning the possession of the still would be excluded, the court holding that the doctrine of collateral estoppel precluded the Government from introducing that evidence at the later trial. The court specifically distinguished its collateral estoppel holding from the doctrine of double jeopardy. Although Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), holds that collateral estoppel also has

9. The charge was as follows:
     I also point out to you, and, again, you are aware of this from your own observations, that the defendant Fassoulis did not take the stand and testify on his own behalf as a witness in this case. Under our system he had no obligation to get on the stand and offer any evidence at all. Indeed, he doesn't have to offer any other evidence through witnesses. He can simply remain silent, and that is his right and privilege under our system.
     Therefore, I instruct you that you are not to hold against him, or, indeed, for him, the fact that he availed himself of his right not to testify here as a witness. Indeed, I ask you not even to consider it at all one way or another in your deliberations.

10. Appellant also raises three additional arguments in order to preserve them for "further appeal, if necessary." We agree that the claims of error so "preserved" are controlled by decisions adverse to appellant.

11. The Fifth Amendment guarantee against double jeopardy was made applicable to the States in Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). That case makes it clear that collateral estoppel, and res judicata, have constitutional standing in criminal cases. See Sealfon v. United States, 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180 (1948).

constitutional dimensions in criminal cases, the effects of the two principles remain different. In any event, *Yawn* is not applicable to the present case inasmuch as collateral estoppel could not have arisen until after the verdict.

In a later case in our own circuit, United States v. Bletterman, 279 F.2d 320 (2 Cir. 1960), appellant was convicted of conspiracy. Although the indictment alleged six overt acts, it was conceded on appeal that no evidence whatever had been introduced at trial to connect appellant with one of them. We said that the erroneous submission to the jury of this unproven overt act was harmless because proof of the remaining acts "not only was clearly established, but indeed was undisputed." *Id.* at 322. See also United States v. Bottone, 365 F.2d 389, 394–395 (2 Cir. 1966), cert. denied 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966). Thus, even if *Yawn* were apposite, we would still need to decide whether the alleged error was harmless. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705 (1967); Traynor, The Riddle of Harmless Error (1970).

■■ Here there is no need to speculate either as to whether the verdict was influenced by the unproven overt acts or to weigh the likelihood of such influence. Even if the jury considered the unproven acts in arriving at its verdict, the conspiracy conviction can be independently upheld in view of the guilty verdicts returned by the same jury on substantive Counts Five, Eight, Twelve and Sixteen. A conspiracy conviction may be sustained upon a showing of overt acts in furtherance of the conspiracy even if the overt acts are not alleged in the indictment. United States v. Armone, 363 F.2d 385, 400 (2 Cir.), cert. denied, 385 U.S. 957, 87 S.Ct. 398, 17 L. Ed.2d 303 (1966); United States v. Negro, 164 F.2d 168 (2 Cir. 1947). By

validly returning guilty verdicts on the four substantive counts, counts which clearly set forth acts done in furtherance of the conspiracy alleged in Count One, the jury demonstrated its belief that appellant, found guilty of mail fraud, also conspired so to defraud by using the mails. Thus, the erroneous submission of the unproven overt acts was harmless beyond a reasonable doubt.[12]

Affirmed.

12. Appellant also objects on due process grounds that overt act six in the indictment, eliminated at the prosecution's request, was not completely obliterated in the jury copy and hence the jury had before it a charge which had been dropped from the case. This claim is without merit.