**UNITED STATES of America, Appellee,**

v.

**Michael LaBARBARA, Jr.,
Defendant–Appellant.**

**No. 808, Docket 96–1391.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 6, 1997.

Decided Oct. 31, 1997.

Arthur J. Viviani, New York City, for Defendant–Appellant.

William Gurin, Assistant United States Attorney, Eastern District of New York (Zachary W. Carter, United States Attorney, Susan Corkery, Assistant United States Attorney, of counsel), Brooklyn, NY, for Appellee.

Before: WINTER, Chief Judge, OAKES and CABRANES, Circuit Judges.

WINTER, Chief Judge:

Michael LaBarbara, Jr., appeals from a conviction after a jury trial for conspiracy to steal union welfare benefits in violation of 18 U.S.C. § 371, theft from an employee-benefit plan in violation of 18 U.S.C. § 664, embezzlement of union property in violation of 29 U.S.C. § 501(c), and seven counts of mail fraud in violation of 18 U.S.C. § 1341. LaBarbara was sentenced by Judge Spatt to 108 months imprisonment and five years supervised release, ordered to make restitution of $8,300,000, and charged a special assessment of $550.

We hold that the evidence of the use of the mails was legally insufficient on three of the mail-fraud counts. Otherwise, we affirm.

## BACKGROUND

We view the evidence in the light most favorable to the government. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). During all

pertinent times, LaBarbara served as the principal officer of Local 66, General Building Laborers' International Union. In that capacity, he negotiated collective bargaining agreements with the Concrete Contractors of Long Island ("Association"), an association of contractors who employed members of Local 66. Under these agreements, the employers were obligated, *inter alia*, to make contributions to various Local 66 Fringe Benefit Funds ("Funds") based on the number of hours worked by members of Local 66.

One member of the Association and a signatory to the agreements with Local 66 was Strathmore Concrete Company ("Strathmore"), a company owned by one Al Barone. To avoid Strathmore's contractual obligations to contribute to the Local 66 Funds, Barone engaged in a practice known as "double breasting." This practice involved the use of a second corporation owned by Barone, Ju–Lin Building Corporation ("Ju–Lin"), which was not a party to agreements with Local 66. Under this practice, employees would receive a weekly check from Strathmore for working up to thirty hours, and a corresponding contribution would be made to the Funds. For all hours worked over thirty, employees would receive a weekly check from Ju–Lin, and no contribution to the Funds would be made. As a result, Strathmore avoided paying roughly $100,000 per year due the Funds from 1986 through 1990. To secure Local 66's cooperation in double breasting and LaBarbara's cooperation in other unlawful schemes described *infra*, Barone agreed to pay LaBarbara $250,000, of which $130,000 was actually paid.

LaBarbara also abused for profit his position as administrator and trustee of the Local 66 Training Program, an employer-funded benefit program subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* LaBarbara proposed to the other trustees that the Training Program pay $785,000 for an eleven-acre parcel of land for use as a training facility for Local 66 members. LaBarbara did not disclose to the trustees that the land was to be purchased from Barone through Ju–Lin or that Barone had purchased the land for only $449,500 three weeks earlier.

As an employer of Local 66 members, Barone was deemed under ERISA to be a "party in interest" to the Training Program. 29 U.S.C. § 1002(14)(c). ERISA prohibits transactions with a party in interest absent express authorization from the United States Department of Labor. 29 U.S.C. § 1106. No such authorization was obtained.

During the construction of the training facility, LaBarbara caused yet more ERISA-prohibited transactions. He awarded a number of overpriced construction contracts to Strathmore and to Eastern Landscaping Services ("Eastern"), a company in which LaBarbara's father was an officer. LaBarbara awarded the construction manager's agreement to Strathmore without bidding. Under that agreement, Strathmore's fee was a percentage of the final cost of construction, giving Strathmore an incentive to make the project as costly as possible. Not surprisingly, the evidence at trial revealed numerous acts of overpricing. For example, there was testimony that the amount of concrete purchased for the project far exceeded that which could have been poured into the relevant space. Moreover, Strathmore paid wages to certain individuals designated by LaBarbara. Barone did not know who they were and had no knowledge of whether they had performed services on the project. These payments were ultimately borne by the Training Program.

To finance construction of the training facility, LaBarbara obtained money from the Funds by obtaining a high-interest $4 million mortgage on Local 66's headquarters from the Friesch–Groningsche Hypotheekbank Realty Credit Corporation ("FGH"). To obtain this mortgage, LaBarbara falsely represented to FGH that the trustees of Local 66 and an entity known as the Local 66 Building Corporation had agreed to pledge the union's headquarters as collateral. The Building Corporation was a not-for-profit corporation owned by Local 66, established to shield the union from liability.

In connection with the closing on the mortgage loan, LaBarbara signed documents containing false representations. One was a certification representing that the trustees of Local 66 and the Building Corporation had

met on November 15, 1989, and approved the borrowing. The Funds' attorney, Jeffery Dubin, testified that he obtained from LaBarbara or his personal secretary the information contained in two other false certifications, one again asserting a meeting of trustees on November 15 and another listing as officers of the Building Corporation two individuals who did not know they were officers. Dubin testified that no minutes of a meeting on November 15, 1989, exist and that there is no record of any vote authorizing mortgaging of the union's headquarters. In connection with the loan, Dubin mailed a so-called "scorecard" letter—describing the Training Program, Local 66, and the Building Corporation—to FGH before the closing. After the closing, FGH mailed a letter to National Westminster, which had provided interim financing on the project, settling accounts between the two institutions.

In connection with these transactions, LaBarbara submitted false statements to the Department of Labor in reports required under ERISA. Specifically, he omitted mention of the prohibited transactions and misstated the financial position of the Training Program.

Finally, LaBarbara conspired to steal union funds through dealings with Strathmore Commercial Operations Ltd. ("Strathmore Commercial"), part of Barone's overall Strathmore organization. For example, Strathmore Commercial made payments in the form of discounts, loans, credits, and free services to LaBarbara's son, a Local 66 business agent, in connection with the construction of the son's residence.

## DISCUSSION

On appeal, LaBarbara argues that: (i) the evidence of his use of the mails was legally insufficient on three of the mail-fraud counts, (ii) the union's headquarters was not union property, (iii) the district court erred in its treatment of prior convictions as criminal history rather than as relevant conduct in determining his base offense level under the Sentencing Guidelines, and (iv) the evidence was insufficient on several other counts.[1]

### A. Proof of Mailings

Three of LaBarbara's mail-fraud convictions turn on the alleged mailing by the Training Program of three checks to Eastern. LaBarbara's challenge to the sufficiency of the evidence faces a heavy burden, because we must view the evidence in the light most favorable to the government and ask only whether a rational jury could find beyond a reasonable doubt that LaBarbara caused the three mailings. *See, e.g., Glasser,* 315 U.S. at 80, 62 S.Ct. at 469; *United States v. Pipola,* 83 F.3d 556, 564 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 183, 136 L.Ed.2d 122 (1996); *United States v. Giraldo,* 80 F.3d 667, 673 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 135, 136 L.Ed.2d 83 (1996). Nevertheless, we agree that the evidence of mailing on those counts was legally insufficient.

 There is no direct evidence that the Training Program mailed the three checks to Eastern. However, use of the mails may be established by circumstantial evidence, *see, e.g., United States v. Srulowitz,* 785 F.2d 382, 387 (2d Cir.1986); *United States v. Toliver,* 541 F.2d 958, 966 (2d Cir.1976); *United States v. Fassoulis,* 445 F.2d 13, 17 (2d Cir. 1971), but the standard of proof is, as with every element of a crime, beyond a reasonable doubt. *Srulowitz,* 785 F.2d at 386–87; *see also United States v. Baker,* 50 F.2d 122, 123 (2d Cir.1931). For example, in *Srulowitz,* a mail-fraud conviction was overturned for insufficient proof of mailing where the letter in question was found only in the files of someone other than the addressee. That person speculated that he might have gotten it from the addressee, who in turn speculated that, if the letter had been in his files, it would have arrived by mail. 785 F.2d at 387. However, there was no envelope, date stamp, or testimony from the addressee's secretary who normally opened the mail. We held that the evidence was "entirely too thin" to support a conviction for mail fraud. *Id.*

Furthermore, inferences drawn from circumstantial evidence such as routine practice

---

1. LaBarbara also objects to certain jury instructions. These objections were raised only on appeal. We have examined them and determined them to be wholly without merit.

have been held insufficient in cases where there is evidence of alternative methods of delivery. In *Baker*, for example, there was testimony that the letters involved might have been delivered by hand, and the court held that in those circumstances the circumstantial proof of mailing was insufficient to exclude a reasonable doubt. 50 F.2d at 123; *see also Fassoulis*, 445 F.2d at 17 (distinguishing *Baker* as holding that method of indirect proof is insufficient where there is evidence of alternative method of delivery).

■ However, not all evidence of an alternative method of delivery will foreclose a conviction based on circumstantial evidence of mailing. *See United States v. Huber*, 603 F.2d 387, 399 (2d Cir.1979). In *Huber*, there was testimony that checks like those at issue were typically mailed in the ordinary course of business. There was also testimony that other checks, apparently of a different kind, were picked up by hand. Nevertheless, we held that the evidence of alternative methods did not undermine as a matter of law "the use of customary business practices as proof of mailing." *Id.* Thus, evidence of an alternative method of delivery must cast significant doubt on the government's circumstantial evidence of mailing to render the latter legally insufficient.

■ We believe that the circumstantial evidence relied upon by the government in the instant matter is legally insufficient. The checks were found in the files of the Funds, after being cashed by Eastern. The government argues that one can infer the mailing of checks both from records of the Training Program indicating the mailing of other documents such as contracts, change orders, and invoices and from the presence of Eastern's address on some of those other documents. However, the three checks were handwritten and did not have Eastern's address on their face. Moreover, the fact that LaBarbara's father was an officer of Eastern renders hand delivery a plausible method and further undermines any inference of mailing. Final-

ly, there was evidence that some of the other documents relied upon by the government were in fact not mailed. For example, there was testimony that change orders were generated at the construction site and were not mailed. As in *Srulowitz*, the evidence of mailing is "entirely too thin" to support a conviction. 785 F.2d at 387.

### B. *Union Property*

■ LaBarbara next argues that his conviction for embezzlement of union "property" under 29 U.S.C. § 501(c) should be reversed because the union headquarters he caused to be mortgaged was not owned by the union.[2] LaBarbara did not raise this argument in the district court and bases a claim of constitutionally ineffective assistance of counsel on this omission.

LaBarbara's argument is wholly frivolous. The unchallenged testimony at trial was that Local 66 owned the Building Corporation, which was only a shell intended to shield the union from liability. By mortgaging the assets of the Building Corporation to enrich himself and his family, LaBarbara clearly diverted assets—the value of the building and therefore the value of the Building Corporation—to himself in violation of Section 501(c).

LaBarbara's argument to the contrary rests on a misreading of *Reich v. Compton*, 57 F.3d 270 (3d Cir.1995). The court in *Compton* held that ERISA's prohibitions against certain indirect transactions between a plan and a party in interest under Section 406(a)(1) of ERISA, 29 U.S.C. § 1106(a)(1), "do not automatically prohibit transactions between a plan and an alter ego of a party in interest." 57 F.3d at 278. Unlike the instant case, *Compton* was concerned with alter egos of a party in interest, not alter egos of an entity to which the defendant owes a fiduciary duty. More importantly, *Compton* is about 29 U.S.C. § 1106(a)(1), not about Section 501(c). The fact that ERISA's prohibitions against certain indirect transactions

---

**2.** Section 501(c) reads:

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

have been held not to apply automatically to alter egos of parties in interest under 29 U.S.C. § 1106(a)(1) hardly leads to the conclusion that a union official can embezzle from an alter ego of the union without running afoul of 29 U.S.C. § 501(c).

## C. *Use of Prior Convictions in Sentencing*

In calculating LaBarbara's criminal history category under the Guidelines, the district court included a prior conviction of LaBarbara for violating the Taft–Hartley Act by accepting gratuities from an employer. La-Barbara argues that the district court erred in considering that conviction as relevant to criminal history under U.S.S.G. § 4A1.2 rather than as relevant conduct determining his base offense level under U.S.S.G. § 1B1.3. We disagree.

■ Appellate review of a district court's determination of whether particular acts are relevant conduct for purposes of Section 1B1.3 employs clear-error analysis. *United States v. Vazzano,* 906 F.2d 879, 883 (2d Cir.1990); *see also Giraldo,* 80 F.3d at 679; *United States v. Rodriguez,* 989 F.2d 583, 585 (2d Cir.1993); *United States v. Chartier,* 970 F.2d 1009, 1015 (2d Cir.1992). To the extent that the issue is whether the district court properly construed terms like "common scheme or plan," however, review is *de novo.* *See Chartier,* 970 F.2d at 1015.

Application Note 1 of Guidelines Section 4A1.2 provides:

"Prior sentence" means a sentence imposed prior to sentencing on the instant offense, other than a sentence for conduct that is part of the instant offense. *See* § 4A1.2(a). A sentence imposed after the defendant's commencement of the instant offense, but prior to sentencing on the instant offense, is a prior sentence if it was for conduct other than conduct that was part of the instant offense. Conduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3 (Relevant Conduct).

Guidelines Section 1B1.3 provides, in pertinent part, that relevant conduct includes:

solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction.

U.S.S.G. § 1B1.3(a)(2). A "common scheme or plan" requires that the offenses "be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" U.S.S.G. § 1B1.3 Application Note 9(A).

We have held that a finding of a common scheme or plan must be based on subjective as well as objective elements. *See Chartier,* 970 F.2d at 1016. In *Chartier,* we found no common scheme or plan connecting four robberies. *Id.* The victim of the first robbery was a fast-food restaurant. However, when the defendant and his cohorts decided that the proceeds were too meager, they turned to robbing banks. Further, the identity of the other perpetrators constantly shifted, and one of the robberies was done on the spur of the moment. *Id.* Although the issue in *Chartier* involved the relatedness of prior offenses under Section 4A1.2(a)(2) Application Note 3, the relevant test involved the existence of a "common scheme or plan," and there is no reason to conclude that that term has a different meaning when used in Section 1B1.3. *Chartier* itself treated "common scheme or plan" under Section 4A1.2(a)(2) Application Note 3, and under Section 1B1.3(a)(2), as the same inquiry. *See Chartier,* 970 F.2d at 1015 (quoting *Vazzano,* 906 F.2d at 883, a case under Section 1B1.3(a)(2)). Furthermore, in *Chartier,* as in this case, the defendant argued that his conduct *did* constitute a common scheme or plan, in *Chartier* to avoid "career offender" status, here to avoid an increased criminal history category.

■ There are some similarities between LaBarbara's 1989 Taft–Hartley violation and the offenses that are the subject of this appeal. The 1989 convictions were for accepting gratuities from an employer that amounted to either bribery or extortion. LaBarbara's greed is certainly common to

both sets of crimes; each involved LaBarbara's willingness to abuse his positions of trust for profit; and there is a temporal overlap. Moreover, there is also some overlap of victims in that Local 66's members may have suffered some diminution in wages and benefits as a result of the payments to LaBarbara that were the subject of the 1989 conviction as well as harm from the loss to the Funds in the instant case. Nevertheless, we agree with the district court that the two sets of crimes were not part of a common scheme or plan.

■ The fact that LaBarbara was personally enriched by the two sets of crimes is not by itself enough to establish a common scheme or plan. *Chartier*, 970 F.2d at 1016. Moreover, the differences between the two sets of crimes easily outweigh the similarities. With regard to the present offenses, the co-conspirators were different; members of LaBarbara's family, as well as LaBarbara himself, were enriched; and the Funds were victims as well as the individual members. Most significantly, the nature of the two sets of crimes was different. As noted, the 1989 crimes involved bribery by, and/or extortion from, employers. The gravamen of the crimes here was embezzlement through purchases of land and overpriced construction contracts, a fraudulent mortgaging of union property, false filings, and fraudulent concealment. Indeed, the differences between the crimes in the instant matter exceed those between the crimes in *Chartier*.

Offenses that are not part of a common scheme or plan may nevertheless be part of the "same course of conduct"

> if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of

conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required.

U.S.S.G. § 1B1.3 Application Note 9(B). Before the adoption of this definition, our caselaw had held that "[t]he 'same course of conduct' concept ... looks to whether the defendant repeats the same type of criminal activity over time. It does not require that acts be 'connected together' by common participants or by an overall scheme. It focuses instead on whether defendant has engaged in an identifiable 'behavior pattern' of specified criminal activity." *United States v. Perdomo*, 927 F.2d 111, 115 (2d Cir.1991) (quoting *United States v. Santiago*, 906 F.2d 867, 872 (2d Cir.1990)) (citation omitted).

Whether our earlier interpretation and the new definition of "the same course of conduct" are identical need not be determined because the district court's analysis was proper under either. The court found that the offenses were not part of the same course of conduct because embezzling from the union is dissimilar from accepting gratuities from employers in exchange for favorable terms. While the offenses bear some very general resemblance to each other, we agree that there is no substantial similarity.[3]

### D. *Other Insufficiency Claims*

LaBarbara also claims that the evidence was legally insufficient to show that Local 66's activities affected commerce, that funds protected under ERISA were stolen, and that there was a mail-fraud scheme in connection with the mortgage of the union's headquarters. All are meritless.

■ The proof was easily sufficient to meet the "affecting commerce" standard. *See Russell v. United States*, 471 U.S. 858, 859 n. 4, 105 S.Ct. 2455, 2456 n. 4, 85 L.Ed.2d

---

**3.** LaBarbara's argument for a "broad" reading of "relevant conduct" based on *United States v. Silkowski*, 32 F.3d 682 (2d Cir.1994), is misconceived. *Silkowski* holds that Section 1B1.3(a)(2) "is to be interpreted broadly to include: conduct for which the defendant was acquitted; conduct related to dismissed counts of an indictment;

conduct that predates that charged in the indictment; and conduct not charged in the indictment." *Id.* at 688 (citations omitted). *Silkowski* does not stand for the proposition that the standard to be applied to this broad class of acts should itself be broad.

829 (1985); *Scarborough v. United States,* 431 U.S. 563, 571, 97 S.Ct. 1963, 1967, 52 L.Ed.2d 582 (1977); *United States v. American Bldg. Maintenance Indus.,* 422 U.S. 271, 280, 95 S.Ct. 2150, 2156, 45 L.Ed.2d 177 (1975). Individual crimes need involve only a *de minimis* effect on interstate commerce, so long as the crime as defined in the statute has a substantial effect. *United States v. Lopez,* 514 U.S. 549, 558, 115 S.Ct. 1624, 1629, 131 L.Ed.2d 626 (1995); *United States v. Leslie,* 103 F.3d 1093, 1100 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 1713, 137 L.Ed.2d 837 (1997). The activities of Local 66, a member of the larger International Laborer's Union, involved substantial building construction projects on Long Island and easily satisfied that standard.

LaBarbara next argues that his conviction on Count 13, aiding and abetting a violation of 18 U.S.C. § 664,[4] is invalid because the amounts not paid to the Funds as a result of the double-breasting scheme never were assets of the Funds. His argument seems to be that moneys owed to ERISA benefit plans are not assets of such plans until banked. We disagree. Once wages were paid to Local 66 members, Strathmore had contractual obligations to the Funds that constituted "assets" of the Funds by any common definition. Certainly, an audit of the Funds would have to include such fixed obligations as assets. LaBarbara's acquiescence in the use of Ju–Lin as a vehicle to convert those assets to Barone and to conceal Strathmore's contractual obligations aided or abetted a violation of Section 664. *See United States v. Panepinto,* 818 F.Supp. 48, 50–51 (E.D.N.Y.1993) (finding no embezzlement with respect to delinquent fund contributions), *aff'd,* 28 F.3d 103 (2d Cir.1994). *But see Young v. West Coast Indus. Relations Ass'n,* 763 F.Supp. 64, 74–76 (D.Del.1991), *aff'd,* 961 F.2d 1570 (3d Cir.1992). Indeed, LaBarbara's accepting kickbacks in return

for allowing Strathmore to avoid its obligations to the Funds was the functional equivalent of, and more harmful than, stealing directly from the Funds' bank accounts.

As to the sufficiency of the proof of mail fraud in connection with the $4 million mortgage loan from FGH, LaBarbara's arguments merely substitute his view of the evidence for that of the jury. LaBarbara contends that these mail-fraud convictions should be overturned because the government proved a single fraud occurring on the day the loan closed, November 20, 1989, and no mailing was involved. However, the jury was well within reason in concluding that the mailing of the "scorecard" letter by Dubin to FGH three and one-half weeks before the closing was caused by LaBarbara and was in furtherance of that fraud. The jury could also reasonably conclude that the letter mailed by FGH to National Westminster settling accounts after the closing was caused by LaBarbara and furthered the fraud. *See Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954) (for mail fraud it is not necessary that use of mails be essential part of scheme but only that mailing is incident to an essential part of scheme and that defendant acted with knowledge that use of mails would follow in ordinary course of business or was reasonably foreseeable).

For the foregoing reasons, we reverse the convictions on Counts 4, 5, and 6. Because LaBarbara's sentences on those counts run concurrently with his sentences on other counts, resentencing is unnecessary. Otherwise we affirm.

---

4. Section 664 reads:
 Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this

title, or imprisoned not more than five years, or both.
 As used in this section, the term "any employee welfare benefit plan or employee pension benefit plan" means any employee benefit plan subject to any provision of title I of the Employee Retirement Income Security Act of 1974.