**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Louis TOLIVER et al.,
Defendants-Appellants.**

**Nos. 1143–45, Dockets 76–1130,
76–1136, 76–1202.**

United States Court of Appeals,
Second Circuit.

Argued June 17, 1976.

Decided Sept. 2, 1976.

DiPasquale, Pack, Hausbeck, Ball & Greenman, Buffalo, N. Y. (Herbert L. Greenman, Buffalo, N. Y., of counsel), for appellant Toliver.

Stephen R. Lamantia, Buffalo, N. Y., for appellant Askew.

David Gerald Jay, Buffalo, N. Y., for appellant Cook.

Richard J. Arcara, U. S. Atty., W. D. N. Y., Buffalo, N. Y. (Roger P. Williams, Asst. U. S. Atty., Buffalo, N. Y., of counsel), for appellee.

Before MANSFIELD, OAKES and GURFEIN, Circuit Judges.

MANSFIELD, Circuit Judge:

Fraudulent schemes usually reveal a level of ingenuity on the part of the swindlers which would, if devoted to honest ends, gain them both profits and community respect. These cases are no exception. They reveal a clever plan tc defraud the New York State Unemployment Insurance Fund by the filing of fictitious claims for unemployment compensation. Though the scheme operated successfully for a period of some two years, its architects were ultimately apprehended, and after a ten-day jury trial in the District Court for the Western District of New York, before John T. Curtin, *Judge,* appellants were convicted of various counts charging conspiracies to use the mails to defraud in violation of 18 U.S.C. § 371, and others charging substantive mail frauds in violation of 18 U.S.C. §§ 1341, 1342.[1] The principle questions raised by them here are whether proof in support of each of the conspiracy counts showed multiple conspiracies rather than the single conspiracy charged, and whether the continuation of the trial while appellant Askew was absent due to illness violated her rights to confront the witnesses against her. We find that neither these nor the other points raised require reversal, and accordingly affirm the judgments of conviction.

To understand the tangled web of fraud a brief description of the workings of the state's unemployment insurance system is essential. In order to obtain unemployment benefits a claimant must first go to his local state unemployment office and fill out a form entitled "original claim for benefits" (Form LO 330). The claimant must list on this form his basic personal data, his places of employment during the past 52 weeks, and the reason why he is currently out of a job. Using the data thus provided, the unemployment office mails an "employment

1. Toliver was found guilty on 5 conspiracy counts, and 13 mail fraud counts, Askew on 3 conspiracy counts and 7 mail fraud counts, and Cook on 5 conspiracy counts and 19 mail fraud counts. Co-defendants George Raspberry and Rosa Bell McClendon pleaded guilty to various counts, while co-defendant Cainetta Raspberry was granted a severance due to a terminal illness. The indictment against co-defendant Kate Lee Cook was dismissed and co-defendant Nathaniel Askew was acquitted. Co-defendant Robert Allen Askew was convicted on three counts but is not involved in the present appeal.

verification and wage data form" (Form LO 12.11) to the claimant's former employer. On this form, the employer lists the hours worked by, and wages paid to, the claimant during the previous 52 weeks, and mails the form LO 12.11 back to the local unemployment office.

On the basis of the wage data provided by the employer, the unemployment office calculates the benefits for which the claimant is eligible. This information is then entered on his form LO 330. When the claimant returns for a previously-set appointment at the unemployment office, he then verifies that he has not worked during the previous week and, assuming that he has not, signs a pay order form (LO 406). This form is then sent from the local office to the unemployment system's central office in Albany. If a computer analysis of the pay order indicates that the claimant was eligible for benefits for the week, a check is drawn and mailed to the claimant's home address. Each week, to be able to receive his weekly check, the claimant must return to the unemployment office, and again verify his unemployment and sign a pay order form.

While the details of the fraudulent scheme used by appellants varied somewhat at the different locations at which they operated over the 1970–72 period, the essential elements were always the same. One conspirator would go to the local unemployment office and fill out a Form LO 330, using either his own or an assumed name. He or she would claim to have been employed either at a defunct business formerly operated by appellant Cook, or more frequently at an actual business not involved in the scheme. Though the name of an actual business was frequently used, its correct address was not given; the bogus claimant would instead give as the firm's mailing address the home address of a conspirator. The unemployment office did not verify the purported employer's address; instead, it routinely mailed the form LO 12.11 to the home of the conspirator. When the Form 12.11 arrived, Cook would confirm the employment of the claimant and give

bogus details as to the wages purportedly paid. He would then sign the form in the name of the actual owner of the business, and give the employer's unemployment insurance identification number, which had previously been obtained through visiting the offices of the employer, who was required by law to post the number. The Form LO 12.11 would then be mailed back to the office, which would calculate the benefits due and, after the false claimant had returned to verify his continued unemployment and sign a pay order form (LO 406), checks would be drawn, mailed to the claimant's address, and usually cashed with the aid of false identification papers.

The government's case consisted primarily of extensive documentary proof. It introduced into evidence numerous fraudulent Form LO 330s, and LO 12.11s, as well as the cancelled checks issued as a result of those forms. An expert witness testified that the handwriting on various of the forms and checks was that of the appellants and of other participants in the scheme. The owners of the legitimate businesses whose names were used in the scheme testified that they had never employed any of the claimants, had never operated their businesses at the addresses given for them by the claimants, and had not signed the Form LO 12.11s bearing their purported signatures. Further evidence indicated that the business formerly operated by Cook was defunct at the time when various claimants alleged they had been employed there, and George Raspberry, a co-defendant who had pleaded guilty at the outset of trial, testified as to his involvement with Cook in the scheme. As corroboratory evidence the government introduced photographs taken by cameras at check-cashing services, showing various defendants and the unemployment checks they were in the process of cashing.

## Discussion

We first turn to the claim by Toliver and Askew that their convictions on the conspiracy counts should be reversed because the government proved multiple rather than single conspiracies. *See, e. g. Kotteakos v.*

*U. S.,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *U. S. v. Bertolotti,* 529 F.2d 149 (2d Cir. 1975). The indictment contains several conspiracy counts (e. g., Counts I, XIII, XXX, XXIV, XXXVI, LI, LVIII, LXIV), each charging a different combination of defendants with conspiracy in violation of 18 U.S.C. § 371 to violate the mail fraud laws, 18 U.S.C. §§ 1341, 1342. Although the names of certain defendants may appear in more than one conspiracy count, the combination of defendants in each conspiracy count differs from that in the others. The only counts which included all three of the present appellants and thus made their joinder together in the indictment proper under Fed.R.Crim.P. 8(b) were the conspiracy and mail fraud counts involving Cook's Auto Care. (*See, e. g.,* Counts XIII, XIV, XXII, XXV, XXIX).

Toliver and Askew argue that the evidence adduced regarding Cook's Auto Care, rather than indicating a single conspiracy, shows two separate conspiracies—one between Cook and Toliver, and the other between Cook and Askew—to file the Cook's Auto Care claims. Finally, they conclude that this variance between pleading and proof substantially prejudiced them. The government conceded at trial that it had no evidence directly tying Toliver and Askew together in the Cook's Auto Care operation. This concession is somewhat surprising in view of the fact that Askew appears to have second-endorsed a check issued to Cook as a purported former employee of Cook's Auto Care; Cook used Toliver's address on this claim. For the most part, however, the evidence adduced in regard to Cook's Auto Care does show only that Toliver and Askew each separately filed claims falsely representing that he or she had worked for Cook's Auto Care, which Cook then certified as their purported employer, and that Cook also filed claims of his own falsely stating that he had worked for Cook's Auto Care.

We find it unnecessary to decide whether this proof, in the context of the overall, highly organized system for filing false claims which was proven at trial, was sufficient to indicate that the government proved a single conspiracy between all three appellants in regard to Cook's Auto Care, as distinguished from two separate conspiracies. As we recently noted in *United States v. Miley,* 513 F.2d 1191, 1207 (2d Cir. 1975), *cert. denied,* 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62.

> "Where the indictment charges one conspiracy, but the proof shows more than one, a variance is not necessarily fatal. 'The true inquiry. . . . is not whether there has been a variance in proof, but whether there has been such a variance as to "affect the substantial rights" of the accused.' *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935)."

Upon this record neither Toliver nor Askew was prejudiced by a variance, if one existed. Indeed, neither even sought to bring the point to the attention of the district judge by moving for a severance below. *Cf. United States v. Payden,* 536 F.2d 541, 542–543 (2d Cir. 1976). *See also United States v. Miley, supra,* 513 F.2d at 1209–10. None of the forms of prejudice which may flow from the joint trial of members of two different conspiracies are disclosed. Here, as in *Miley,* no hearsay statements by a member of one conspiracy incriminating a member of another were admitted into evidence on the theory that both were members of the same conspiracy. Nor did the district judge give a charge of the sort approved in *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), to the effect that a member of one conspiracy might be convicted on the basis of a substantive offense committed by a member of another.

■ The only conceivable source of prejudice to Askew and Toliver is the possibility that their joint trial created a so-called "spill-over" effect, wherein the jury convicted one set of conspirators not on the basis of the evidence relating to them, but by imputing to them guilt based on the activities of the other set of conspirators. The existence of such a "spill-over" or "guilt transference" effect, as it has also

been described, turns in part on whether the numbers of conspiracies and conspirators involved were too great for the jury to give each defendant the separate and individual consideration of the evidence against him to which he was entitled. *See United States v. Bertolotti,* 529 F.2d 149, 156–57 (2d Cir. 1975); Recent Case, 95 U.Pa.L.Rev. 411, 413 n. 7 (1947). Nine persons were here indicted, and six went to trial, virtually the same numbers which we found insufficient in *United States v. Miley, supra,* 513 F.2d at 1209, to raise a possibility of guilt transference, and far fewer than the 29 persons indicted and 17 tried in *United States v. Bertolotti, supra,* 529 F.2d at 156, or the 32 defendants indicted, and 19 tried, in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), where a "spill-over" effect was found to exist. Although the number of conspiracies proven in this case could rise as high as seven (based on the conspiracy counts in the indictment), which is admittedly more than in *Miley, supra,* the fact that each count was clearly keyed to a separate location minimized any risk that the jurors might confuse one conspiracy with another. On this record the number of conspiracies and conspirators, therefore, was not sufficient to indicate a spill-over effect.

More important, Judge Curtin carefully instructed the jury to view the evidence against each defendant on each count separately, and the evidence uniquely lent itself to such a compartmentalized consideration. As we have previously noted, the bulk of the government's case consisted simply of the various documents alleged to have been fraudulently filed or generated by each group of defendants and of expert testimony designed to link each of the documents to specific defendants. While this documentary proof was voluminous, it was presented by the government in a fashion which lent itself to individualized consideration of the charges against each defendant. The handwriting expert, for instance, testified separately about the documents relating to each defendant. It is true that one witness Otis Pender, offered limited testimony to the effect that Rosa Bell McClendon, a co-defendant who pleaded guilty before trial began, had possessed a number of unemployment books, but this testimony, even though unrelated to Toliver and Askew, was hardly of a character that might create prejudice in the jurors' minds against others, much less implicate the appellants. It cannot be compared, for instance, to allowing the jury to spend two entire days "listening to obviously shocking and inflammatory discussions about assault, kidnapping, guns and narcotics", which *United States v. Bertolotti, supra,* 529 F.2d at 158, found to have prejudiced the many defendants in that case, who were not involved in those discussions. In sum, the record here is clear that the alleged conspiracies were proven and that the jury convicted Askew and Toliver on the basis of clear and convincing evidence of their personal involvement in those conspiracies, not through imputing guilt to them from other defendants who may have been involved in other conspiracies or frauds. Any variance was thus harmless error at most.

Askew next urges that the continuation of testimony during a period when illness forced her to be absent from the courtroom constituted a violation of her rights under the Sixth Amendment's Confrontation Clause, and under Fed.R.Crim.P. 43, requiring reversal of her conviction. Askew suffered from asthma, which first forced her to absent herself from the trial on December 22, 1975. Testimony taken on that and the following day did not relate directly to her, and her counsel raised no objection to taking it. When the trial resumed after the Christmas recess on December 29 Askew was still ill in the hospital. The government then recalled the witness Joseph Ruocco, an employee of a firm which provides cameras to check-cashing services, and the trial judge, overruling an objection from Askew's counsel, permitted Ruocco to testify about the chain of custody of certain photographs which the government intended to introduce into evidence as showing Askew cashing fraudulently-obtained unemployment checks.

On the next day, with Askew still absent the trial judge, again overruling an objection by her counsel, permitted the government's expert witness, Hugh L. Sang, to testify that the writing on various forms and checks matched that of handwriting exemplars which later testimony showed to be those of Askew. Following Sang's direct testimony, the court provided Askew's counsel with a transcript of it. Over the New Year's recess beginning on December 30, her counsel prepared his cross-examination, and when trial resumed on January 5, 1976, Askew returned to the courtroom. At her counsel's request Sang was recalled and cross-examined in her presence, after the transcript of his direct testimony and copies of documents analyzed by him had been provided to defense counsel. In addition, his counsel had earlier been furnished with Sang's testimony on the same subject matter given in an earlier trial of Askew for perjury. No similar request was made for the recall of Ruocco.

■ Absent an express waiver or misconduct on Askew's part amounting to a waiver, the trial judge's action in proceeding with trial in the absence of Askew and over her counsel's objection denied her a fundamental constitutional right guaranteed by the Sixth Amendment, which provides that "[i]n all criminal prosecutions the accused shall enjoy the right—to be confronted with the witnesses against him." One of the most important right's provided under the clause "is the accused's right to be present in the courtroom at every stage of his trial." *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970). Even when a defendant has expressly or implicitly waived his right to be present in the courtroom, as he may, *see id; Diaz v. United States*, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912), his trial should not routinely proceed but rather the trial judge should exercise his discretion to continue taking testimony "only when the public interest clearly outweighs that of the voluntarily absent defendant." *United States v. Tortora*, 464 F.2d 1202, 1210 (2d Cir.) *cert. denied*, 409 U.S. 1063, 93 S.Ct. 554, 34 L.Ed.2d 516 (1972). Here, as the govern-

ment concedes, there is no indication that Askew waived her right to be present, as was the case in *Tortora*; her illness was genuine, and her counsel objected to the taking of testimony against her in her absence. While we recognize that while absence or delay on the part of a defendant in a multi-defendant trial often poses a vexatious problem for the trial judge, who is naturally reluctant to adjourn the trial or grant a severance, either of which courses inevitably leads to delay, expense, and loss of valuable time, no other course can be condoned in the absence of a waiver or misconduct by the defendant necessitating his removal to permit trial to proceed. *See, e. g., Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).

■ There remains the question of whether the violation of Askew's constitutional right to be present at all stages of her trial requires reversal of her conviction. Even an error of constitutional dimension may "in the setting of a particular case [be] so unimportant and insignificant" that it does not require automatic reversal of a conviction. *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). Although we indicated in *United States v. Crutcher*, 405 F.2d 239 (2d Cir. 1968), *cert. denied*, 394 U.S. 908, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1969), that a defendant's absence during the empanelling of a jury might be too basic to be treated as harmless, *see also United States v. Clark*, 475 F.2d 240, 247 (2d Cir. 1973), we did so on the ground that his absence during jury selection might prejudice him in ways impossible to determine on an appellate record, because it would deny him "his prerogative to challenge a juror simply on the basis of the 'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks [or] gestures of another." 405 F.2d at 244, quoting *Lewis v. United States*, 146 U.S. 370, 376, 13 S.Ct. 136, 36 L.Ed. 1011 (1892). This reasoning might justify a rule that would require automatic reversal when a defendant has been denied his right to participate in the jury selection process. However, it does not support an extension of such a per se

rule to all stages of a trial. During the cross-examination of a witness, for instance, a defendant does not exercise any absolute prerogative comparable to a preemptory challenge. He may assist his counsel in preparing the cross-examination and suggest areas to be explored or avoided, but the extent to which his absence may impair his ability to do so is capable of appraisal by a reviewing court. When, for example, the witness' testimony concerns matters of which the defendant has no knowledge, it strains credulity to think that the absent defendant might have helped to produce a more effective cross-examination · if he had been present. While the defendant's presence during testimony may sometimes serve a psychological function by impressing witnesses with the consequences which may hang upon their testimony, this too may be accomplished by other means as, for instance, by the presence of codefendants. Finally, when a defendant has been absent during testimony, a trial judge may take corrective measures of the sort Judge Curtin adopted, and the effectiveness of these measures is also open to appraisal in most cases.[2]

██ For these reasons we are satisfied that where the government can demonstrate beyond a reasonable doubt that the violation of a defendant's right of confrontation was harmless error, *Chapman v. California, supra,* 386 U.S. at 24, 87 S.Ct. 824, or, to use the phrasing of *Walker v. United States,* 116 U.S.App.D.C. 221, 322 F.2d 434, 436 (1963), *cert. denied,* 375 U.S. 976, 84 S.Ct. 494, 11 L.Ed.2d 421 (1964), produced "any reasonable possibility of prejudice," a resulting conviction may be upheld. *See, e. g.,* cases where convictions were affirmed

after conversations between court and jury had occurred outside of the defendant's presence. *See, e. g., United States v. Baca,* 494 F.2d 424 (10th Cir. 1974); *Ware v. United States,* 376 F.2d 717 (7th Cir. 1967). *Cf. United States v. Compagna,* 146 F.2d 524 (2d Cir. 1944), *cert. denied,* 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422 (1945). Our review of the record leaves us with the firm conviction that this is such a case.

██ The only witness who testified against Askew in her absence were Ruocco and Sang. Any claim that prejudice resulted from her absence during Ruocco's testimony is patently baseless. Ruocco merely laid the necessary foundation for introduction into evidence of photographs taken by machines at the check-cashing service where the unemployment checks were cashed; he simply stated that the photographs to be offered by the government were taken from rolls of film which his firm had obtained from the service. Similar testimony by Ruocco had been used as the foundation for introduction of the same photographs at a previous trial of Askew, and a transcript of this previous testimony, as well as copies of the photographs, had been provided to Askew's counsel during pretrial discovery. Ruocco did not make any identification of Askew as the person pictured by the photographs. Askew's counsel vigorously cross-examined Ruocco on the chain of custody, and Askew, who had no knowledge of the matter, fails to suggest how she could have improved that cross-examination if she had been present. Indeed, even after Askew's return, her counsel never moved to recall Ruocco for further cross-examination.

2. The Supreme Court has applied the harmless error doctrine as the basis for upholding convictions resulting from trials involving violations of another branch of a defendant's Confrontation Clause rights: his right under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), not to have the confession of a co-defendant implicating him introduced into evidence when the co-defendant does not testify at trial. *See Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 13 L.Ed.2d 208 (1973); *Harrington v. California,*

395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). In certain respects a violation of *Bruton* is even more potentially prejudicial to a defendant than continuation of the trial in his absence, since the *Bruton* defendant, though physically present in the courtroom, has no method to shake the testimony of the witness against him (the co-defendant speaking through his hearsay confession) while counsel for an absent defendant may still cross-examine the witnesses against the defendant.

The situation in regard to Sang's testimony is somewhat more complicated, for the government concedes that his testimony to the effect that the handwriting on various forms and checks matched that of the exemplars taken from Askew was a key link in the proof against her. However, after Sang first gave his direct testimony and was cross-examined by Askew's counsel in her absence, Sang was then recalled after a four-day adjournment during which her counsel was provided with a transcript of the testimony so given and cross-examined in her presence. Askew suggests that she was prejudiced by her absence because it prevented her from telling her counsel how the exemplars were taken. However, Sang did not even testify that the exemplars were those of Askew; that point was covered, in Askew's presence, in the later testimony of Leroy Traub, who had obtained them from Askew. Furthermore, to the extent that knowledge of how the exemplars were taken might help Askew's counsel prepare his cross-examination of Sang, her counsel had ample opportunity to obtain such information from her during the New Year's recess before he began his cross-examination. There is no suggestion that the exemplars were taken from her under any unusual circumstances. Askew next claims that, had she been present, she could have told her counsel earlier about the physical characteristics of her handwriting to help him in his cross-examination of Sang's testimony on this point. However, her counsel again had ample time to obtain this information from her during the recess before his cross-examination, or before trial, since the documents analyzed by Sang, and Sang's report, had all been provided to him as part of pretrial discovery. Since Askew's presence during Sang's direct testimony could not have aided her counsel in any way in shaking Sang's testimony, we hold the error in permitting the examination to proceed partially in her absence to be harmless.[3]

◼ The remaining points raised by appellants deserve but brief discussion. Toliver and Askew make a two-pronged attack on the government's proof of the mailings involved in the case. They contend first that the government offered inadequate evidence to prove the mailings and second that, even if the mailings were proven, they were legally insufficient to bring the scheme within the mail fraud statutes. " 'The use of the mails may be established, like most other facts, by circumstantial evidence.' " *United States v. Fassoulis*, 445 F.2d 13, 17 (2d Cir.) *cert. denied*, 404 U.S. 858, 92 S.Ct. 110, 30 L.Ed.2d 100 (1971), quoting *Stevens v. United States*, 306 F.2d 834, 836 (5th Cir. 1962). Here there was adequate circumstantial proof, including testimony of a New York unemployment official that the department's usual practice was to mail the Form LO 12.11, and the unemployment checks which was corroborated by the fact that the forms and checks in this case had moved on their usual rounds from the office to the employer and from Albany to Buffalo. Appellants' reliance on *United States v. Baker*, 50 F.2d 122 (2d Cir. 1931), is misplaced since, unlike the situation in that case, here there was no indication that another method of delivery might have been used. *See United States v. Fassoulis, supra; United States v. Leathers*, 135 F.2d 507 (2d Cir. 1943).

It is also clear that the mailings, once proven, brought appellants' activities within the ambit of the mail fraud statute. Unlike the situation in *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), where the only mailing concerned a matter of no interest to the defendant and occurred after his scheme had attained its goal, the use of the mails was here essential to the success of defendants' plan since their obtaining the fruits of their fraudu-

---

3. We are also satisfied that in the circumstances of this case, Askew suffered no prejudice based on inability, due to her absence, to exert psychological pressure on the witnesses to tell the truth. Both witnesses had previously testified at this and other trials; the presence of Askew's co-defendants, furthermore, served as a continuing reminder of the consequences of their testimony, and of course, Askew was herself present during the cross-examination of Sang.

lent scheme depended on the postal service's delivery of the unemployment checks to their mailboxes, *see United States v. Wolfish*, 525 F.2d 457, 460 (2d Cir. 1975), *cert. denied*, 423 U.S. 1059, 46 L.Ed.2d 649 (1976); *United States v. Calvert*, 523 F.2d 895, 904 (8th Cir. 1975), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (Feb. 24, 1976); *United States v. Marando*, 504 F.2d 126 (2d Cir.), *cert. denied*, 419 U.S. 1000, 95 S.Ct. 317, 42 L.Ed.2d 275 (1974).

■ Nor do we find any error in the manner used by the trial judge to accept the guilty pleas of two co-defendants after the jury was selected but before the government's case began. The pleas were taken out of the presence of the jury, in contrast to *Payton v. United States*, 96 U.S. App.D.C. 1, 222 F.2d 794 (1955), relied upon by Cook, where the jury was present during the taking of the plea and the trial judge subsequently called the jury's attention to the plea. In this case, Judge Curtin clearly fulfilled his "plain duty . . . to do nothing to increase the possibility of prejudice to the remaining defendants" that might result to co-defendants from the taking of a guilty plea from one during a joint trial, as we instructed in *United States v. Kelly*, 349 F.2d 720, 767 (2d Cir. 1965), *cert. denied*, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed. 544 (1966), where we recognized that "in the natural course of events guilty pleas during joint trials are to be anticipated". Immediately after the pleas were taken he gave cautionary instructions of the sort approved by us in *United States v. Price*, 447 F.2d 23, 30 (2d Cir.), *cert. denied*, 404 U.S. 912, 92 S.Ct. 232, 30 L.Ed.2d 186 (1971). Indeed, Cook's counsel himself voiced satisfaction with these instructions at the time. In his later charge to the jury, Judge Curtin again stressed that defendant Raspberry's plea of guilt and his testimony for the government should not color their view of the evidence against the remaining defendants, who were entitled to be judged solely on the basis of the evidence against them.

For the foregoing reasons, we affirm the judgments of conviction.