865 F.2d 262
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jessie James SMITH a/k/a Jesse James Smith a/k/a Jewell
Farless, Jr., (87-1817), James Haddix (87-1832),
Nancilee Adams (87-1855), Freeda
Bergevin (87-1856),
Defendants-Appellants.
 Nos. 87-1817, 87-1832, 87-1855 and 87-1856.
 United States Court of Appeals, Sixth Circuit.
 Dec. 28, 1988.
 
 Before ENGEL, KEITH and ALAN E. NORRIS, Circuit Judges.
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 Defendants, Jessie James Smith, James Haddix, Nancilee Adams, and Freeda Bergevin, appeal their convictions for conspiracy to distribute in excess of fifty kilograms of marijuana, in violation of 21 U.S.C. Sec. 846 and 21 U.S.C. Sec. 841(a)(1). All defendants contend that there was insufficient evidence to support their convictions, three argue they were entitled to separate trials, and one claims the district court erred in refusing to dismiss the indictment against her once it was discovered that a government witness had given false evidence to the grand jury.
 
 
 2
 According to the government's evidence, defendants conspired with Ron Wiltse, Bonnie Lott, and others, to distribute marijuana within Michigan penal institutions. Wiltse, the central figure in the conspiracy, and an inmate at various institutions, arranged to have his friend, Bonnie Lott, pick up marijuana in Texas. She made three trips, bringing back a total of 200 pounds (90.7 kilograms) of marijuana, and distributed it to defendants and other conspirators, pursuant to Wiltse's instructions.
 
 
 3
 Smith served as assistant to the rabbi at the Jackson prison, and smuggled marijuana into the prison by concealing it in his clothing. An inmate at Jackson, Haddix had arranged with his father to conceal marijuana in reams of copy paper and ship it to the prison's paralegal office where Haddix worked. Adams was a secretary and office manager of the paralegal office and handled the money Haddix received from the sale of the marijuana; she also signed for the shipments of copy paper as they arrived at the prison. Bergevin smuggled marijuana into Kinross prison for her husband, an inmate there.
 
 
 4
 The district court denied motions for separate trials. Before Lott testified, she informed government counsel, who in turn advised the court and defense counsel, that at Wiltse's request she had given false testimony to the grand jury. Defense counsel's motion to dismiss the indictment was denied. The trial court also overruled defendants' motions for acquittal, made pursuant to Fed.R.Crim.P. 29.
 
 Sufficiency of Evidence
 
 5
 The standard for reviewing claims of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Gallo, 763 F.2d 1504, 1518 (6th Cir.1985), cert. denied, 474 U.S. 1068 (1986). "The government must be given the benefit of all inferences which can reasonably be drawn from the evidence, even if the evidence is circumstantial. It is not necessary that the evidence exclude every reasonable hypothesis except that of guilt." United States v. Adamo, 742 F.2d 927, 932 (6th Cir.1984) (citations omitted), cert. denied, 469 U.S. 1193 (1985). Neither the trial judge nor the appellate court may weigh conflicting evidence or consider the credibility of witnesses. Id. at 935. Accordingly, arguments that government witnesses were impeached, questioned, or gave contradictory testimony, are largely irrelevant. United States v. Rios, 842 F.2d 868, 872 (6th Cir.1988); Adamo, 742 F.2d at 935. "[A]ttacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence." Adamo, 742 F.2d at 935.
 
 
 6
 The common thread in defendants' arguments is that no value can be credited to the testimony from the government's primary witnesses, Wiltse and Lott,[1] and that, without that testimony, the government did not prove a conspiracy. The district judge specifically cautioned the jury:
 
 
 7
 Some special instructions [are] appropriate with respect to the testimony of witness Bonnie Lott and witness Wiltse.
 
 
 8
 They have each admitted lying before the Grand Jury. The testimony of a perjurer should always be examined with great caution.
 
 
 9
 Furthermore, the evidence concerning the nature of their relationship and communications during the Grand Jury investigation pending trial, and during trial, gives you reason to examine their testimony with special care.
 
 
 10
 I do not instruct you to disregard their testimony, because you may find it to be credible in important respects. Under the total circumstances, however, I instruct you to weigh the testimony of these two witnesses with extreme care.
 
 
 11
 One way to exercise such caution is to determine whether a fact asserted by one of them is supported by other direct or circumstantial evidence, and to inquire if he or she may have some motive for giving false testimony concerning the fact asserted by the witnesses.
 
 
 12
 The government maintains that key aspects of the testimony of Wiltse and Lott are corroborated by documentary and circumstantial evidence.
 
 
 13
 The government's theory was that Adams and Haddix functioned as Wiltse's contacts inside the prison. Wiltse instructed Lott to deliver marijuana to Jim Coote, Haddix' father, for packaging in containers from Econo Office Supply, and mailing to the prison paralegal office.
 
 
 14
 Adams admitted to a personal relationship with Haddix, and to handling money for him by exchanging cash for money orders and mailing them to Coote. Postal workers confirmed that Adams frequently purchased money orders in large denominations. Lott's records and canceled money orders revealed that in 1984 Lott sent $875 on October 18, $750 on November 15, and $1,000 cash on December 6 to Adams at her post office box.
 
 
 15
 As secretary and office manager, Adams was responsible for delivering mail and ordering office supplies. Adams signed for deliveries of paper from Econo Office Supply. From September through December 1984, 105,000 sheets of paper from Econo Office Supply were delivered to the office, which uses 170,000 sheets per year, in addition to the paper from the office's regular supplier. No payment was ever made to Econo Office Supply. In December, when Adams' supervisor noticed the accumulation of paper, she announced that she would sign for deliveries in the future. Adams quit her job two weeks later. According to both Haddix and Adams, she knew the boxes from Econo Office Supply were for Haddix.
 
 
 16
 In denying the motion for acquittal, the district court noted that the evidence against Adams was quite strong when the court considered the money orders, Lott's records, the large volume of paper, and the relationship between Adams and Haddix. We agree.
 
 
 17
 Although the only evidence that Adams possessed marijuana came from Wiltse, the evidence that she was heavily involved in facilitating the entry of marijuana into the prison and in handling the proceeds of its sale, is sufficient to prove her knowledge and participation in the conspiracy.
 
 
 18
 The district court noted that "[t]he testimony with respect to Haddix and Adams is almost inseparable.... [W]ithout a good circumstantial evidence case against Nanci Adams, I don't think there would be a very good case against Haddix." Haddix admitted that his father sent paper into the prison, but said it was for his use in a black market photocopying business. He also admitted that he destroyed records in the paralegal office concerning Econo Office Supply.
 
 
 19
 The government contended that Haddix' involvement in the conspiracy was often accomplished through his father, Jim Coote. According to Lott, Coote built secret compartments for storing marijuana in her van, and she gave Coote sizeable amounts of marijuana on several occasions. Photographs of the altered van were produced at trial. Adams said Haddix gave her large amounts of money to send to Coote. Wiltse testified that he asked Haddix to smuggle marijuana into the prison and that, when Haddix obtained marijuana, he took a cut for himself and then gave the rest to Wiltse for distribution. He also said Haddix explained to him how a ream of paper could be altered to conceal marijuana.
 
 
 20
 The black market photocopying theory was undercut by a lack of evidence that the copy machine in Adams' office was overused, and by testimony from the copy machine service manager that a serviceman would notice that a copy machine counter had been tampered with. Given the substantial amount of evidence, including his own admissions that he was making big money and was responsible for a large volume of paper coming into the paralegal office, coupled with Coote's participation in Lott's end of the importation scheme, the jury could reasonably infer that Haddix' activities related to the distribution of marijuana.
 
 
 21
 As a rabbi's assistant, Smith was not subject to search when he entered and left the prison. Wiltse testified that Smith brought marijuana into the prison through its chapel. Both Wiltse and Haddix were placed on the list of Jewish prisoners and were permitted to go to the chapel. Lott's records reflected that marijuana was mailed to Smith at his post office box on four occasions, and that she mailed a $300 money order to Smith.
 
 
 22
 Smith argues that, at most, he can only be found guilty of a conspiracy to distribute less than fifty kilograms because he was only involved with marijuana from Lott's first trip to Texas. However, Lott's records showed that he also received marijuana from her second trip. The evidence was sufficient to establish that Smith knew of the conspiracy to smuggle marijuana into the prison for distribution, and that he participated by bringing marijuana into the prison, and by facilitating opportunities for Wiltse and Haddix to meet in the chapel.
 
 
 23
 Lott first met Freeda Bergevin at the Kinross prison where Wiltse and Jack Bergevin were inmates. Subsequently, Lott personally delivered and mailed to Freeda marijuana from each of her trips. These transactions and several exchanges of money were corroborated by Lott's records. Wiltse testified that Jack Bergevin told him that Freeda smuggled marijuana into the prison. As the district court noted, Freeda's acceptance of marijuana from Lott is sufficient to involve her in the conspiracy.
 
 
 24
 The essence of conspiracy is an agreement to commit a crime. See United States v. Flowers, 818 F.2d 464, 467 (6th Cir.1987). In a prosecution brought under 18 U.S.C. Sec. 846 for conspiracy to commit a drug abuse offense, the government must prove that a conspiracy existed, that defendant knew of it, and that he knowingly and voluntarily joined it. United States v. Christian, 786 F.2d 203, 211 (6th Cir.1986). "Once the existence of a conspiracy is established, only slight additional evidence is required to connect a particular defendant to it." United States v. Hamilton, 689 F.2d 1262, 1275 (6th Cir.1982) (citations omitted), cert. denied, 459 U.S. 1117 (1983). The evidence here showed that each defendant was actively involved in delivering marijuana, or money from the sale of it, or both. When viewed in the light most favorable to the government, the evidence was sufficient for the jury to conclude that each defendant knew about the scheme to import and distribute marijuana inside the prisons, and knowingly and voluntarily participated in it.
 
 Separate Trials
 
 25
 "As a general rule, especially in conspiracy cases, parties who are jointly indicted should be tried together." United States v. Dempsey, 733 F.2d 392, 398 (6th Cir.), cert. denied, 469 U.S. 983 (1984). Fed.R.Crim.P. 14 provides that the court may order separate trials if it appears that defendants will be prejudiced by a joint trial. Denial of a Rule 14 motion will not be reversed unless a defendant can demonstrate that the district court abused its discretion by making a strong showing that he was prejudiced. Gallo, 763 F.2d at 1524-25. "Specifically, he must show an inability by the jury to separate and to treat distinctively evidence that is relevant to each particular defendant on trial. Even if [a] defendant [can] establish some potential jury confusion, this must be balanced against society's need for speedy and efficient trials." Id. at 1525 (citations omitted). "A defendant does not have a right to a separate trial merely because the likelihood of acquittal will be greater if severance were granted," or because defendants present antagonistic defenses. United States v. Day, 789 F.2d 1217, 1224 (6th Cir.1986). "[T]he jury must be presumed capable of sorting out the evidence in considering the case of each defendant separately. Finally, a great disparity of evidence against [different] defendants alone normally will not require separate trials, but it may be a reason to find abuse of discretion." United States v. Thomas, 728 F.2d 313, 319 (6th Cir.1984) (citations omitted).
 
 
 26
 Adams, Smith, and Haddix raise this issue on appeal. They first argue that the evidence showed three different conspiracies involving different persons, prisons and time periods, and each argues that he or she was prejudiced by the spill-over effect of evidence from conspiracies involving other codefendants. The indictment charged a single conspiracy with Wiltse as the hub, defendants as spokes, and a common goal of smuggling drugs into Michigan prisons as the rim. The question of whether single or multiple conspiracies have been proved is a question of fact for the jury. Rios, 842 F.2d at 872. The jury was instructed on the issue and found a single conspiracy; we are unable to say that such a conclusion was not reasonable, given the evidence before it.
 
 
 27
 "The existence of ... a 'spill-over' or 'guilt transference' effect ... turns in part on whether the numbers of conspiracies and conspirators involved were too great for the jury to give each defendant the separate and individual consideration of the evidence against him to which he was entitled." Gallo, 763 F.2d at 1526 (quoting United States v. Toliver, 541 F.2d 958, 962 (2d Cir.1976)). In this case, nineteen persons were indicted, but only five went to trial, as compared to thirty-two defendants indicted and nineteen tried in Kotteakos v. United States, 328 U.S. 750 (1946), and twenty-nine persons indicted and seventeen tried in United States v. Bertolotti, 529 F.2d 149, 156 (2d Cir.1975), in which a spill-over effect was found to exist.
 
 
 28
 The government responds that because all these defendants were part of the same conspiracy, the statements and activities of coconspirators were admissible against them. It also notes that the jury acquitted one of the five brought to trial. That the jury was able to acquit one defendant and convict others "strongly suggests that the jury was not confused by the testimony adduced at trial, and was able to attribute to each [defendant] evidence pertinent to that particular party." Gallo, 763 F.2d at 1526.
 
 
 29
 Defendants have not demonstrated substantial prejudice requiring reversal of the district court's denial of the motions for separate trials.
 
 Motion to Dismiss Indictment
 
 30
 Adams claims that the district court erred in refusing to dismiss the indictment after it was revealed that Lott had given false testimony to the grand jury at Wiltse's direction. Lott told the grand jury that she sent marijuana to Adams; at trial, Lott denied sending any marijuana to Adams. There is no contention that the government knowingly used perjured testimony before the grand jury, but Adams suggests that the government should have known of the perjury before trial. She also argues that an indictment based upon testimony of a perjurer and the one who procurred the perjury cannot stand.
 
 
 31
 The rule in this circuit is that, upon learning that perjured testimony was presented to the grand jury, the prosecutor
 
 
 32
 must personally weigh the untainted evidence supporting the government's case and decide if the evidence is such that a jury of twelve is likely to unanimously find that the evidence establishes guilt beyond a reasonable doubt. If the prosecutor is doubtful of such a result, the untainted evidence may be resubmitted to the grand jury.... The prosecutor may also decide that the untainted evidence is insufficient to warrant pursuing the prosecution further and move to dismiss the indictment. A conscientious government attorney will go to trial only if personally satisfied that the untainted evidence is sufficient to meet the government's burden of proof.... We see no reason to impose the rigid ... rule and deprive the prosecutor of the right to exercise these options.
 
 
 33
 Adamo, 742 F.2d at 941 (footnote omitted).
 
 
 34
 In this case, jeopardy had attached before the prosecutor learned of the perjured grand jury testimony. His only choice then was to continue with the trial or move to dismiss the indictment, which would bar reprosecution. The government asserts that the prosecutor weighed the untainted evidence and determined that it was sufficient to sustain a conviction.
 
 
 35
 Although the district court, as part of its supervisory power over the prosecutor, may dismiss an indictment under appropriate circumstances, there was no error in refusing to dismiss the indictment under the circumstances of this case. There was sufficient untainted evidence before the jury to sustain a conviction, the prior false testimony was fully brought out at trial, and the jury was carefully instructed to scrutinize Lott's testimony.
 
 
 36
 For the reasons stated above, the judgments of the district court are affirmed.
 
 
 
 [1]
 Defendants emphasize that both Wiltse and Lott admitted giving false testimony to the grand jury, and destroying and falsifying records of marijuana transactions. At trial, Lott continued to testify as directed by Wiltse. The district judge noted that Lott was no more than a puppet for Wiltse. "[S]omehow or other, he got a spell over her and has almost complete control. And I think she would--she would do anything he told her." "I've never seen such total domination of a witness by another witness in my life."