Vacated by Supreme Court, February 23, 2009

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
             *Plaintiff-Appellee,*

v.                                              No. 07-4103

JOHN ALVIS JACKSON, JR.,
             *Defendant-Appellant.*

UNITED STATES OF AMERICA,
             *Plaintiff-Appellee,*

v.                                              No. 07-4094

LARRY ANDREW CAREY,
             *Defendant-Appellant.*

Appeals from the United States District Court
for the Western District of Virginia, at Lynchburg.
Norman K. Moon, District Judge.
(6:04-cr-70118)

Argued: January 31, 2008

Decided: May 1, 2008

Before WILLIAMS, Chief Judge, and MOTZ and
KING, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in
which Chief Judge Williams and Judge Motz joined.

**COUNSEL**

**ARGUED:** Melissa Windham Friedman, ANDERSON & FRIED-MAN, Roanoke, Virginia; Joseph Abraham Sanzone, SANZONE & BAKER, P.C., Lynchburg, Virginia, for Appellants. Thomas Ernest Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Anthony F. Anderson, ANDERSON & FRIEDMAN, Roanoke, Virginia, for Appellant John Alvis Jackson. John L. Brownlee, United States Attorney, Jennie M. Waering, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia; Amanda L. Riedel, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

**OPINION**

KING, Circuit Judge:

John Alvis Jackson, Jr. and Larry Andrew Carey (together, the "Defendants"), were prosecuted in the Western District of Virginia on multiple fraud and theft offenses involving a loss of more than $15 million. The Defendants were each convicted by a jury in early 2006 of the following offenses:

- two counts of bank fraud, in contravention of 18 U.S.C. § 1344 (the "bank fraud offenses");

- five counts of wire fraud, in violation of 18 U.S.C. § 1343 (the "wire fraud offenses");

- a single count of making false statements in documents required by the Employee Retirement Income Security Act of 1974 ("ERISA"), in contravention of 18 U.S.C. § 1027 (the "ERISA false statement offense");

- two counts of theft from an ERISA-covered pension plan, in violation of 18 U.S.C. § 664 (the "ERISA theft offenses"); and,

- a single count of theft from a health care benefit program, in contravention of 18 U.S.C. § 669 (the "health care program theft offense").

Jackson was also convicted of conspiracy to commit various federal offenses, in violation of 18 U.S.C. § 371 (the "conspiracy offense"). In late 2006, Jackson was sentenced to 108 months in prison and Carey was sentenced to 87 months. These consolidated appeals ensued.

On appeal, the Defendants present multiple contentions of error. First, they challenge their convictions on the ERISA theft offenses, raising the primary issue in this appeal: whether, pursuant to § 664 of Title 18, unpaid employer ERISA pension plan contributions constitute "assets" of the plan. Second, the Defendants contest the sufficiency of the evidence supporting certain of their convictions. Finally, they challenge their sentences on several grounds. As explained below, we reject their contentions and affirm.

I.

A.

On September 15, 2005, a grand jury in the Western District of Virginia returned an indictment against the Defendants, charging them with, inter alia, the bank fraud offenses (Counts One and Two), the wire fraud offenses (Counts Three through Seven), the ERISA false statement offense (Count Ten), the ERISA theft offenses (Counts Eleven and Twelve), the health care program theft offense (Count Thirteen), and the conspiracy offense (Count Fourteen).[1] The

---

[1]The indictment alleged two other offenses — bank fraud, in violation of 18 U.S.C. § 1344 (Count Eight), and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Count Nine) — and made a forfeiture allegation pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(2) and (7) (Count Fifteen). Jackson and a third defendant, his daughter, were charged in Counts Eight and Nine. Jackson's daughter was never tried and the charges against her were dismissed. The prosecution dismissed Counts Eight and Nine against Jackson. Count Fifteen, the forfeiture allegation, was also dismissed.

Defendants pleaded not guilty and were tried before a jury over an eleven-day period in February and March 2006.

The prosecution's trial evidence consisted primarily of extensive business records and the testimony of several fact and expert witnesses. Jackson testified on his own behalf, denied involvement in any criminal activity, and presented six witnesses in support of his defense. Carey presented expert testimony in his defense, but did not testify. The trial evidence is summarized below.[2]

1.

The Burruss Company, a wood products business involved in the manufacturing of flooring for tractor-trailers and residential homes, was headquartered in Galax, Virginia, with offices in Lynchburg, Virginia, and manufacturing plants in Virginia, Tennessee, and Kentucky. Jackson served as President and Chief Executive Officer of Burruss from 1989 until October 2000. Carey began working for Burruss in 1976 and eventually became its Chief Financial Officer, a position he held until October 2000.

In 1991, investor Grant Minor Wilson and two others purchased Burruss. Wilson served as one of Burruss's directors from 1991 through 1994. In 1995, Wilson created Burruss Holding Company and exchanged his Burruss stock for the ownership of Burruss Holding (the "1995 refinance"). Burruss and Burruss Holding then retired the balance of Burruss's stock for approximately $14 million procured by loan from Fleet Capital, and issued a promissory note for $10 million to buy out the other Burruss shareholders. Burruss, as a result, became a wholly owned subsidiary of Burruss Holding. Wilson, by controlling Burruss Holding, became its primary representative and dealt directly with Jackson, Burruss's President and CEO, and Carey, its CFO.[3]

---

[2]The facts spelled out herein are drawn from the trial record. We recite the evidence in the light most favorable to the prosecution, as the prevailing party at trial. *See United States v. Bursey*, 416 F.3d 301, 304 n.1 (4th Cir. 2005).

[3]Burruss Holding sold part of its shares to other investors, reducing Wilson's direct ownership to about 45%. The shares of the other Burruss Holding investors were held in voting trusts, however, and Wilson had the right to vote those shares for ten years.

The 1995 refinance resulted in a loan agreement that Burruss negotiated with Fleet, dated April 7, 1995. In his newly acquired capacity, Wilson discussed the Fleet loan agreement extensively with Jackson and Carey. The loan agreement was asset-based, and Burruss collateralized the Fleet loan with its fixed-assets and working-capital. The fixed-assets portion of the Fleet loan was secured by Burruss's real estate, machinery, and equipment, and was initially for $6 million. Between 1995 and 2000, the Fleet loan agreement was amended multiple times to increase Burruss's borrowing capacity under the fixed-assets portion of the loan. The balance of the fixed-assets portion of the loan, as of September 28, 2000, reached over $10 million. The second aspect of the Fleet loan related to Burruss's working-capital, and was secured by its accounts receivable and inventory. The working-capital portion comprised the "lion's share" of the loan, with the amount thereof varying from day-to-day. As of September 28, 2000, the principal of the working-capital part of the Fleet loan was over $25 million, and at other times it exceeded $31 million.

The terms of the Fleet loan agreement required that all of Burruss's assets be pledged as collateral. Consequently, any funds received by Burruss from selling its assets were to be paid to Fleet. Under the loan agreement, Burruss was entitled to sell only $25,000 worth of equipment annually without Fleet's approval. In addition to pledging Burruss's assets as collateral for the Fleet loan, a "support agreement" required its officers to operate and maintain Burruss in a manner that would properly support the Fleet loan, and to promptly inform Fleet of any fraud, conversion, or misapplication of Burruss's assets, or any breach of the loan agreement. Wilson, Jackson, and Carey executed support agreements with respect to the Fleet loan.

2.

By 1996, Burruss began having problems paying its vendors in a timely fashion and was unable to maintain its inventory and raw materials. Several of Burruss's small vendors needed to be paid in a shorter time frame than the business could accommodate, and thus declined to sell supplies to it. Jackson discussed with Wilson the creation of an entity to purchase timber from small vendors and resell it to Burruss with an industry-standard markup, enabling Burruss to accumulate and maintain the inventory it needed. Soon thereafter,

Jackson and his wife, along with Carey, formed a separate business called Virginia Wood Products ("VWP"). VWP served as a broker to secure timber for Burruss and provided it with sixty- to ninety-day payment terms. Burruss was then able to secure raw materials (primarily timber) through VWP from vendors who would no longer sell directly to Burruss.

The books and records of Burruss, however, revealed that many of the small vendors selling to VWP were also continuing to sell supplies to Burruss. Although VWP had no storage facilities and did not physically handle the timber it purchased for delivery to Burruss — and even though VWP's work was actually performed by Burruss employees — VWP marked-up the price of such timber by 5% to 8% before reselling it to Burruss. VWP did not typically pay its vendors any more expeditiously than Burruss did.

In addition to its inventory issues, Burruss had additional difficulties in 1996. One of its most profitable facilities was largely destroyed by fire, severely impacting Burruss's profits. In addition, a Canadian company entered the tractor-trailer flooring business, competing with Burruss and severely reducing its most profitable component. Burruss recovered from those difficulties, however, and eventually became an even larger producer of residential flooring.

In 1998, Jackson asked Wilson for a salary increase and a bonus, explaining that he had not received either in some time. In response, Wilson raised Jackson's salary to $200,000 per year, plus a $50,000 yearly bonus. Wilson agreed that Jackson could draw his bonuses from a Burruss Holding account maintained at Wachovia Bank in Lynchburg (the "secret Wachovia account"), in order to conceal payment of the bonuses from other Burruss personnel. The secret Wachovia account was not referenced or listed in any of Burruss's records, and was thus concealed from Fleet.

3.

Between 1995 and 1999, the Fleet loan agreement was amended at least eight times to increase Burruss's borrowing limits. Under the working-capital portion of the loan agreement, Burruss had a borrowing base of 85% against its eligible accounts receivable, 70% against

its raw materials, and 65% against its finished goods. In order to obtain an advance under the loan agreement, Burruss was obligated to submit a Borrowing Base Certificate ("BBC") to Fleet, on which it reported the current status of its inventory and eligible accounts receivable.[4] Carey was primarily responsible for preparing the BBCs, and, in doing so, compiled a list of Burruss's inventory and eligible accounts receivable — sometimes from inventory reports and sometimes by fabricating them. A Carey subordinate, Donna Elliott — Burruss's office manager and corporate secretary in Galax — actually completed the BBCs and transmitted them by fax to Fleet in North Carolina. In response, Fleet wired the advanced funds to a Burruss account at Wachovia in Lynchburg.[5]

4.

As Burruss financially deteriorated throughout 1998, Jackson and Carey began inflating the company's assets on the BBCs they used to obtain advances under the Fleet loan. BBCs were inflated in several ways: (1) by falsely creating inventory from a closed plant; (2) by creating false invoices for goods that had not been sold; (3) by falsely overvaluing inventory; and (4) by altering the original dates of accounts receivable. In carrying out this asset inflation scheme, Jackson repeatedly instructed Carey to mischaracterize raw lumber as purchased goods, thereby inflating the BBCs. Jackson also suggested to Carey that such raw lumber be characterized as finished product, thus increasing Burruss's borrowing power. At Carey's direction, Elliott faxed false inventory reports and inflated BBCs to Fleet on four occasions in September and October of 2000.[6]

---

[4]"Inventory," for purposes of the BBCs, meant all of Burruss's raw materials and finished goods. "Eligible accounts receivable" meant all of Burruss's accounts receivable excluding invoices more than sixty days past due or ninety days beyond an original date.

[5]The Burruss account at Wachovia Bank in Lynchburg was used as Burruss's primary operating account. It is separate and distinct from the secret Wachovia account maintained by Burruss Holding.

[6]The false inventory reports and inflated BBCs constitute the underpinnings of the wire fraud offenses (Counts Three through Seven).

In 1999 and 2000, Jackson sold nine pieces of Burruss's equipment, valued at a total of approximately $260,000, without notifying Fleet as required by the loan agreement. Although these assets were owned by Burruss and pledged to Fleet, the proceeds from the sales were deposited into the Burruss Holding secret Wachovia account. Carey largely used the secret Wachovia account for deposits of insurance receipts, tax refunds, and other funds representing assets of Burruss that had been pledged to Fleet. Neither Jackson, Carey, nor any other Burruss representative notified Fleet that its collateral had been sold, or that funds representing collateral under the Fleet loan agreement had been deposited in the secret Wachovia account. Jackson and Carey paid themselves from the secret Wachovia account the sums of approximately $514,000 and $230,000, respectively, between May 1998 and February 2000. Jackson also directed Carey to pay $68,000 to VWP from the secret Wachovia account, without any supporting invoices. During that same period, VWP was used to distribute substantial sums of money from Burruss to Jackson and Carey personally. Between 1997 and 2000, VWP paid Jackson over $473,000, and Carey over $530,000.

5.

During the relevant period, Burruss maintained three separate ERISA plans, for both pension and health purposes, that covered most of its 1200 to 1400 employees. First, Burruss maintained a pension plan for its non-union salaried employees (the "Company Plan"). Second, it maintained a pension plan for its unionized employees (the "Union Plan").[7] Third, Burruss established and utilized a health care benefit program for its employees (the "Health Plan"). Each of these ERISA plans was used by the Defendants as a vehicle for carrying out offenses underlying these appeals. The relevant details of the three ERISA plans and their relationships to the various offenses are described further below.

---

[7]The Union Plan was limited to unionized employees working at Burruss's plant in Alcoa, Tennessee. The contributions to that Plan were substantially less than those made to the Company Plan.

a.

Under the Company Plan, an account was maintained for each eligible participant, and the funds and moneys in each participant's account resulted from employer contributions made by Burruss. Burruss was obligated to contribute 3% of the aggregate annual compensation of all eligible participants to the Company Plan. The Company Plan obligated Burruss to provide each plan participant with an annual account statement, as of the last day of the calendar year. Pursuant to an "Adoption Agreement" of 1994, the Company Plan required Burruss to allocate and credit the annual employer contributions to the proper participant accounts.[8]

The Union Plan required Burruss to establish a bookkeeping account for each eligible unionized employee, to pay into each account the participant's share of Burruss's annual Plan contributions, and to prepare annual participant statements after making the proper allocations for each Plan Year. The Union Plan defined the "valuation date" as the "last day of the Plan Year," and gave each participant a vested and nonforfeited interest in his plan account. J.A. 2872-74.[9] The Adoption Agreement defined a Plan Year as twelve consecutive months ending December 31st, and it required Burruss to contribute fifteen cents to the account of each plan participant for each hour of service.

Burruss was designated as the Plan Administrator for the Company Plan and Carey served as Assistant to the Plan Administrator. Carey was designated as Plan Administrator for the Union Plan. Jackson and Carey both performed administrative duties for each of the Plans. Accordingly, Jackson signed the bargaining agreement with the union; and both Carey and Jackson signed the Plan contribution checks. The Trustee for both Plans was Crestar Bank, which was later renamed SunTrust Bank. Each Plan Administrator possessed the "primary authority for filing the various reports, forms and returns with

---

[8]The Company Plan and the Union Plan have separate Adoption Agreements, which establish the Plans and define the terms and conditions thereof.

[9]Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

the Department of Labor and the Internal Revenue Service." J.A. 2788. For example, Carey, on behalf of the Company Plan, filed a Form 5500 Annual Return/Report of Employee Benefit Plan for Plan Year 1997 with the Department of Labor.

As of December 31, 1998, Burruss owed approximately $322,000 to the Company Plan for Plan Year 1998. Pursuant to IRS regulations, Burruss was entitled to defer its 1998 contribution until its federal income tax return was due on March 15, 1999, or, if it obtained a filing extension, until September 15, 1999. On October 15, 1999, Burruss filed its 1998 Form 5500 for the Company Plan with the Department of Labor, signed by Jackson. On the Form 5500, Jackson stated that Burruss owed $322,169 to the Company Plan and that it had made the Plan contribution in that amount. The Form's question 15(c) required that the sum of any funding deficiency be reported, and Jackson left the question blank. As of October 15, 1999, however, Burruss had made no contributions to the Company Plan for Plan Year 1998.

In early 2000, Frank Dishman, a pension account manager with Crestar Bank, met with Jackson and Carey concerning Burruss's ERISA plan obligations. According to Dishman, Jackson and Carey believed that "they did not have to make these [contributions], that they had discontinued making contributions to the plan." J.A. 1527-29. Dishman advised them that Burruss could cease making its Plan contributions only by terminating the Plans according to law. Dishman also advised the Defendants that Burruss had not made its 1998 Company Plan contribution. In response, Carey falsely asserted that he had mailed the 1998 contributions for both Plans to Crestar in December 1999. Dishman, however, advised them that Crestar had not received any such payments.

Carey thereafter directed Elliott to falsely record, on Burruss's general ledger of March 29, 2000, that Burruss had sent a check to Crestar Bank on December 31, 1999, for the 1998 Company and Union Plan contributions.[10] On April 14, 2000, Dishman again advised

---

[10]Contributions for the Company and Union Plans were overdue in early 2000 and Burruss assertedly combined its annual contributions into one check.

Carey by letter that Crestar had not received the 1998 Company Plan contribution. On April 18, 2000, however, the Trustee received a Burruss check dated December 20, 1999, signed by Jackson and Carey, for the 1998 Company and Union Plan contributions. When Dishman's successor from SunTrust Bank, Sybill Wolff, asked Carey about the late contributions, Carey asserted that he had given the check to Dishman earlier, who had probably lost it.

Burruss was obligated, for Plan Year 1999, to contribute over $324,000 to its Company and Union Plans. In 2000, Jackson and Carey separately observed in the company records that the 1999 contributions to the Plans were due by September 15, 2000, and Jackson mentioned the possibility of terminating the Company Plan. Wolff met with Carey in mid-August 2000 and reminded him that the 1999 contributions to the Plans were due by September 15. As that date approached, Wolff repeatedly called Carey and advised him to make the 1999 contributions. Although Carey assured her that Burruss would make those contributions, it never did. Wolff thereafter called Carey several times concerning the missed payments. Carey avoided most of those calls. When he did respond, he simply asserted that a mistake must have been made. Wolff also called Jackson, who directed her to speak to Carey about the problem. On October 18, 2000, Wolff advised Carey by letter that Burruss had not made its 1999 contributions to the Company and Union Plans, and that Burruss could be penalized for not making them.

In early September 2000, SunTrust Bank sent Burruss the 1999 individual account statements for the participants of both Plans. Each statement reflected a participant's account balance for the Plan Year ending December 31, 1999, reflecting Burruss's contribution for that Plan Year. SunTrust later advised the participants of both Plans that, although it had mistakenly credited their accounts with accrued benefits for the 1999 Plan Year, an "earnings reversal" had been made because Burruss "failed to submit the required contribution for the 1999 Plan Year." J.A. 722-30. SunTrust also informed the participants that "[s]ince the statement you received last year included an accrual for that contribution, an adjustment has been made on the enclosed statement to reflect the fact that no contribution was received." *Id.*

b.

As mentioned above, Burruss also maintained an ERISA Health Plan for its employees, and contracted with the Piedmont Community Health Plan ("PCHP") to process health care claims. Jackson signed the PCHP contract on behalf of Burruss, and Carey administered the Health Plan in conjunction with Jacqueline Mosby, PCHP's controller. In order to finance the Plan, Burruss made weekly withholdings from its employees' earnings for contributions to the Health Plan.

In 2000, Burruss began paying PCHP only part of its employee withholdings for the Health Plan, resulting in a $698,000 deficiency by June of that year. On August 1, 2000, Burruss failed to pay PCHP more than $109,000, even though those moneys and funds had been withheld from its employees' earnings for health care contributions. By early October 2000, PCHP had ceased paying health care claims under the Health Plan, resulting in substantial unpaid medical expenses for the covered Burruss employees.[11]

6.

In June of 2000, Jackson and Carey hired Ray Equi to oversee Burruss's reporting to Fleet on the BBCs. Equi promptly discovered that Burruss's inventory and accounts receivable had been overstated on the BBCs and, in August 2000, he prepared and directed memoranda to that effect to both Jackson and Carey. Equi also refused to sign any inflated BBCs. On August 17, 2000, Equi advised Jackson that Burruss's inventory and accounts receivable were being overstated, that Burruss was close to its lending limits on the Fleet loan, and that much of its inventory and accounts receivable were not loan-eligible. In August 2000, Carey fired Equi, who later served as a key witness for the prosecution.[12]

---

[11]As a result of PCHP's failure to pay health care claims for Burruss's employees, the affected employees became personally liable for their medical expenses. Ironically, Jackson was forced to pay over $36,000 for his own heart surgery in October 2000.

[12]Other important witnesses for the prosecution included Grant Wilson, who controlled Burruss Holding; Donna Elliott, the corporate secretary; and Frank Dishman, of Crestar (SunTrust), the Trustee of the Company and Union Plans.

On October 18, 2000, Wilson and Carey flew to Atlanta for a meeting with Fleet. During the trip, Carey advised Wilson that Burruss was suffering from inventory shortages and, after the meeting, Wilson travelled to Galax to examine Burruss's finances. After examining Burruss's records, Wilson ascertained that it had overstated its assets on the BBCs submitted to Fleet by more than $11 million, and that Burruss was in serious financial trouble.

On October 24, 2000, Wilson hired Kevin O'Halloran, a crisis manager from Newbridge Management LLC, to operate Burruss. O'Halloran and Ralph Brotherton, a CPA, then conducted an extensive review of Burruss's records. They interviewed Carey repeatedly, seeking to ascertain Burruss's true financial condition. Carey admitted that he had intentionally inflated the BBCs submitted to Fleet in order to obtain working capital for Burruss and to make the business more attractive to potential buyers. Carey also acknowledged that he had deposited Burruss's insurance receipts, tax refunds, and other funds into the secret Wachovia account. Carey asserted that he had not made the 1998 and 1999 ERISA contributions to the Company and Union Plans because there were more pressing expenses due. Carey explained that Burruss's financial problems should be resolved after being sold, and that he expected a personal financial benefit from the sale.[13] Significantly, O'Halloran and Brotherton testified against the Defendants at trial. Unfortunately, all efforts to sell Burruss failed. Ascertaining that it had no other option, Burruss declared bankruptcy on November 7, 2000.

B.

At the conclusion of the prosecution's case-in-chief, and again at the conclusion of the trial evidence, the Defendants moved for judgments of acquittal. *See* Fed. R. Crim. P. 29(a) (authorizing motion for judgment of acquittal after conclusion of prosecution's case-in-chief and again at conclusion of all evidence). The court denied these acquittal motions, however, and the jury found Jackson guilty on all charges, and Carey guilty on all charges except the conspiracy offense.

---

[13]Wilson made unsuccessful efforts to sell Burruss in 1999 and 2000.

In post-trial proceedings, Jackson and Carey renewed their motions for judgments of acquittal and also sought, in the alternative, a new trial. *See* Fed. R. Crim. P. 29(a) and 33. The district court denied those requests, explaining its rulings in a Memorandum Opinion filed on June 7, 2006 (the "Opinion").[14] The Opinion's bases for these rulings, specifying that the various convictions were amply supported by the evidence and that there was no sound reason for awarding the Defendants a new trial, included the following:

- On the bank fraud and wire fraud offenses, the evidence was sufficient to support Jackson's convictions because he oversaw the daily operations of Burruss, was Carey's superior, was familiar with the borrowing arrangement with Fleet, had directed Carey to inflate inventory, had instructed Elliott to overvalue inventory to increase Burruss's borrowing power, and had been advised by Equi that the accounts receivable were inflated. *See* Opinion 3-4.

- On the wire fraud offenses, the evidence supported Jackson's convictions because he "knew of and approved previous faxes to Fleet, and could foresee that the inflated [BBCs] would continue to be faxed." *Id.* at 5.

- On the bank fraud offenses, the court observed that, although "a bank must be the intended victim of a bank fraud scheme, it need not be the immediate victim." *Id.* at 7. Here Burruss was a victim of the fraud scheme, but "Fleet suffered the ultimate risk of loss." *Id.*

- On the ERISA false statement offense, the evidence was sufficient to sustain Jackson's conviction because company policy required him to sign checks above a certain sum, and he had not sought to correct the 1998 Form 5500 (although he knew that a 1998 Plan contribution had not been made). *Id.* at 8.

---

[14]The district court's Opinion is found at J.A. 2464-81.

- The evidence was sufficient to support Carey's conviction on the false statement offense in Count Ten, in that he was a co-signer on company checks and had created false accounting entries to cover-up nonpayment of the 1998 ERISA contributions. *Id.* at 8-9.

- On the ERISA theft offenses, the employer contributions to ERISA pension funds became assets of the ERISA plans when they became due and payable. The Defendants were not required to be fiduciaries of the Plans because 18 U.S.C. § 664 prohibits "any person" from committing a § 664 offense, and makes no reference to fiduciary status. *Id.* at 10-12.

- Jackson was not entitled to judgment of acquittal on the ERISA theft offenses because the "handwriting from his planner and notepads indicat[ed] that he knew the pension contributions were due," demonstrating his "reckless disregard for the interest of the pension plans." *Id.* at 12.

- On the health care program theft offense, the government, by "showing that funds were withheld from employee paychecks for contribution to the healthcare plan," presented sufficient evidence to sustain the Defendants' convictions. *Id.* at 13-14.

- On the conspiracy offense, the evidence was sufficient to establish that Jackson had conspired with Elliot in inflating the BBCs. *Id.* at 15.

- Finally, the Defendants' were not entitled to a new trial, because the evidence was sufficient to sustain their convictions and because they were not prejudiced by the improper exclusion or admission of evidence. *Id.* at 16-17.

### C.

The presentence investigation reports (the "PSRs") for Jackson and Carey calculated their advisory sentencing ranges under the 2000 edi-

tion of the Sentencing Guidelines. The PSRs grouped their offenses and awarded them base offense levels of 4, *see* USSG § 2B1.1(a), to which they added the following: two-level increases because the grouped offenses involved more than minimal planning, *id.* § 2B1.1(b)(4)(A); four-level increases for substantially jeopardizing the safety and soundness of a financial institution, *id.* § 2B1.1(b)(6)(A); two-level increases for embezzling from ERISA plans while serving as plan fiduciaries, *id.* § 3B1.3; and seventeen-level increases because the loss exceeded $10 million, *id.* § 2B1.1(b)(1)(R). Jackson's PSR also recommended a two-level increase because he committed perjury while testifying at trial. *Id.* § 3C1.1. Premised on criminal history categories of I, Jackson's total offense level was 31 and his advisory sentencing range was 108 to 135 months, and Carey's total offense level was 29 and his advisory sentencing range was 87 to 108 months.

The district court conducted Jackson and Carey's sentencing hearings on January 3, 2007, and, after largely accepting the PSRs' recommendations, the court denied the prosecution's motion for role-in-the-offense enhancements against Jackson and Carey. Importantly, the court also ruled that the PSRs' recommended seventeen-level increases for causing a loss exceeding $10 million were applicable. The Defendants objected to this ruling, contending that the loss calculations made in the PSRs were incorrect. They asserted that the loss calculations should reflect only the actual and foreseeable loss, which was less than $10 million. They also claimed that Burruss and its assets had been overvalued from the beginning and that the loss suffered by Fleet was due to Burruss's unforeseeable decision to file for bankruptcy. The court rejected these contentions and, after weighing the evidence, the advisory Guidelines ranges, and the 18 U.S.C. § 3553(a) sentencing factors, sentenced Jackson and Carey at the bottom of their advisory ranges: 108 and 87 months, respectively. The Defendants thereafter filed these appeals, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

In their consolidated appeals, the Defendants first contend that they cannot be subjected to criminal liability under § 664 of Title 18 for the two ERISA theft offenses. Additionally, they contest the suffi-

ciency of the evidence to support certain of their convictions. We address these contentions in turn.[15]

A.

With respect to their convictions on the ERISA theft offenses in Counts Eleven and Twelve, the Defendants contend that the district court erred when it ruled that unpaid employer contributions to the Company and Union Plans constituted "assets" of the Plans under 18 U.S.C. § 664.[16] Specifically, they assert that their convictions on the ERISA theft offenses must be vacated, as a matter of law, because "unpaid employer contributions are not assets of a plan until they are paid into the plan unless the plan documents specifically state otherwise." Br. of Appellants 28-29. Because the Plan documents fail to specify that unpaid employer contributions constitute plan assets, the Defendants maintain that they cannot be guilty of the ERISA theft

---

[15]The Defendants have also raised challenges to their sentences, which are disposed of in Part III hereof.

[16]The primary issue in this appeal relates to whether, under 18 U.S.C. § 664, unpaid employer ERISA pension plan contributions constitute "assets" of the plan. Section 664 provides, in relevant part, that

> [a]ny person who embezzles . . . or unlawfully and willfully . . . converts to his own use . . . any of the moneys, funds . . . or other assets of any [ERISA plan] shall be fined . . . or imprisoned . . . or both.

The ERISA theft offenses relate specifically to the Company and Union Plans. Count Eleven of the indictment, alleges, in pertinent part, as follows:

> That between on or about January 1, 1999 and on or about March 15, 2000, in the Western District of Virginia, the [D]efendants, . . . while fiduciaries of the Company Plan, did embezzle, steal and unlawfully and willfully abstract and convert to their own use, and to the use of others, an amount not less than $318,246.27, which constitutes moneys, funds, securities, premiums, credits, property and other assets of the Company Plan, an employee pension benefit plan subject to [ERISA].

J.A. 59-60. Count Twelve, in operative language that is identical to that in Count Eleven, relates to the conversion of the moneys and funds of the Union Plan.

offenses. They further contend that, even if the unpaid ERISA contributions were assets of the Company and Union Plans, they cannot be guilty because they were never fiduciaries of the Plans.

Relying primarily on the Second Circuit's opinion in *United States v. LaBarbara*, 129 F.3d 81 (2d Cir. 1997), the district court ruled that unpaid employer contributions become "credits" and are ERISA "plan assets" when they are "due and payable to the plan." Opinion 9-11. The court deemed irrelevant the Defendants' claim that they had never served as fiduciaries of the Plans, because § 664 explicitly applies to "any person" who steals or embezzles the moneys, funds, or assets of an ERISA plan. We review de novo a ruling by a district court on an issue of statutory interpretation. *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006); *see also LaBarbara*, 129 F.3d at 86, 88 (reviewing de novo district court's interpretation of statutory term "assets" under § 664).

1.

In order to prove the ERISA theft offenses, the prosecution was obligated to establish the elements of § 664, i.e., that Jackson and Carey (1) committed acts of embezzlement or conversion; (2) that such acts of embezzlement or conversion involved the moneys, funds, or assets of an ERISA plan; and (3) that such acts were committed with the specific intent of depriving the ERISA plan of its moneys, funds, or assets. *See* 18 U.S.C. § 664; *see also United States v. Whiting*, 471 F.3d 792, 800-01 (7th Cir. 2006) (observing that § 664 is violated when any person willfully or intentionally converts ERISA funds to his own use or use of another); *United States v. Krimsky*, 230 F.3d 885, 860 (6th Cir. 2000) (observing that, for conviction under § 664, prosecution must prove accused embezzled or converted funds, moneys, or assets of ERISA plan with specific intent of depriving plan of such moneys, funds, or assets).[17] Although § 664 does not

---

[17]On Counts Eleven and Twelve, the district court instructed the jury, in a manner consistent with the foregoing authorities, as follows:

Elements which must be proved beyond a reasonable doubt before a defendant may be found guilty under [§ 664] proscribing embezzlement are . . . [one,] the defendant fraudulently and

explicitly provide that unpaid employer contributions constitute ERISA plan assets, § 1103 of Title 29 specifies that such assets are held in trust, and not for the employer's benefit. The Second Circuit concluded that, when an ERISA employer has paid wages or salaries to its employees, it is contractually bound to contribute to any ERISA plan that it maintains. In its *LaBarbara* decision, the court decided that an employer must comply with its contractual obligations to make contributions to its ERISA plan, and that such a contractual obligation constitutes an "asset" of the ERISA plan. *See* 129 F.3d at 88; *see also In re Luna*, 406 F.3d 1192, 1198-1201 (10th Cir. 2005) (holding that contractual right to collect unpaid contributions is plan asset).

Notwithstanding the Defendants' assertions that Burruss's unpaid employer contributions did not constitute assets of the Company and Union Plans for purposes of the ERISA theft offenses, the relevant facts and legal principles support the district court's ruling. When Burruss established its ERISA pension plans, it bound itself to the terms thereof. Both Plans mandated annual contributions based upon hours worked, and wages and salaries paid. Burruss could properly extricate itself from those ERISA obligations only by proper termination of the Plans. *See* 29 U.S.C. § 1103. We thus agree with the district court and the Second Circuit, and are satisfied that Burruss's unpaid contributions to the Plans constituted the "moneys, funds, or assets" thereof for purposes of § 664. As a result, the Defendants' contention in that regard must be rejected.

2.

The Defendants also contend that, even if the unpaid ERISA contributions were assets of the Company and Union Plans, they never-

---

willfully embezzled, stole, or converted property, money or funds to his own use or the use of another; [two,] the property, money, or funds taken belonged to an employee benefit plan subject to ERISA; [and three,] the defendant acted with the intent to deprive the pension plan of its funds, with reckless disregard for the interests of the pension plan.

J.A. 2220-21.

theless cannot be guilty of the ERISA theft offenses because they were never fiduciaries of the Plans. The Defendants assert that, in order for them to be criminally liable under § 664, the prosecution had to prove that they were such fiduciaries. *See Luna*, 406 F.3d at 1198, 1201 (observing that for defendant in civil ERISA fraud action to be personally liable, he must be fiduciary of ERISA plan). Indeed, as they point out, Counts Eleven and Twelve actually allege that the Defendants were fiduciaries. *See* J.A. 59-61 (alleging that Defendants, "while fiduciaries" of the Plans, embezzled and converted moneys, funds, and assets of Plans).

The district court ruled against the Defendants on this point, however, because § 664 plainly applies to "any person" who steals or embezzles the moneys, funds, or assets of an ERISA Plan. Opinion 11-12. Importantly, the court's instructions to the jury were consistent with § 664, and did not mandate a jury finding that either Jackson or Carey were fiduciaries. Counts Eleven and Twelve, in alleging that the Defendants were fiduciaries of the Plans, were thus at odds with the express terms of § 664. Such surplusage does not constitute appellate error, however, for at least three reasons. First, the Defendants did not pursue a variance or surplusage claim in the district court or on appeal.[18] Second, § 664 does not require that an accused be a fiduciary, but is plainly drawn in terms of "any person."

Finally, in these circumstances, the Defendants were shown to be fiduciaries of the Plans. Under ERISA, a "fiduciary" is a person who "exercises any authority or control respecting management or disposition of its assets, . . . or discretionary responsibility" with respect to

---

[18]Because the Defendants have not raised a variance or surplusage claim on appeal, any such claim has been waived. *See* Fed. R. App. P. 28(a)(9)(A) (requiring appellant's brief to contain contentions and reasons for them, with citations to authorities and parts of record relied on); *United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) (observing that contentions not raised in opening brief are waived). Even if the Defendants had raised such a claim, however, it would not alter the result here, because the fiduciary allegations of the ERISA theft offenses were merely surplusage and not error. *See Ford v. United States*, 273 U.S. 593, 602 (1927) (holding that allegations of indictment unnecessary to and independent of essential allegations may be ignored).

an ERISA plan. 29 U.S.C. § 1002(21)(A). ERISA also provides that an "administrator" is an example of a fiduciary. *Id.* § 1002(14)(A). ERISA defines an "administrator" as "the person specifically so designated by the terms of the instrument under which the plan is operated." *Id.* § 1002(16)(A)(I).

The Defendants contend that SunTrust, rather than either of them, was the Plan Administrator of the Company and Union Plans. Carey, however, was expressly named as Plan Administrator in the Union Plan's documents, and as Assistant Plan Administrator in the Company Plan documents. Furthermore, in *Phelps v. C.T. Enters., Inc.*, 394 F.3d 213, 221 (4th Cir. 2005), we observed that, even though an officer of a business is not a named fiduciary of an ERISA plan, he is nevertheless a fiduciary when he assumes plan responsibilities or exercises control over whether to pay plan contributions. Jackson, as Burruss's CEO, was thus a fiduciary of the Company and Union Plans, because he assumed Plan responsibilities and exercised control over whether Burruss made its ERISA plan contributions. Under the undisputed facts, both Jackson and Carey performed administrative duties associated with the Plans: (1) Jackson signed Form 5500 as Plan Administrator and sponsor for Plan Year 1998; (2) Carey signed the Form 5500 as Plan Administrator for Plan Year 1997; (3) Jackson signed the collective bargaining agreement with the union; and (4) both Carey and Jackson signed the ERISA plan contribution checks.[19]

## B.

The defendants next challenge the sufficiency of the evidence in support of certain of their convictions — both defendants challenge the evidence on a bank fraud offense (Count Two); Jackson challenges the evidence on the other bank fraud offense (Count One), as

---

[19]The Defendants argue that the Tenth Circuit's decision in *Luna* supports their position on appeal, and that their convictions on the ERISA theft offenses cannot stand because they were not "acting" as fiduciaries when they diverted the Plans' assets to their own use. *See Luna*, 406 F.3d at 1203-04 (observing that employers who exercise neither control nor authority over ERISA plan assets are not fiduciaries of plan). The Defendants' reliance on *Luna* is misplaced, however, because it is not controlling precedent and is factually distinguishable.

well as on each of the wire fraud offenses (Counts Three through Seven); and Carey challenges the evidence on the ERISA false statement offense (Count Ten). Under our precedent, an appellate review of a sufficiency issue is only to assess "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Young*, 248 F.3d 260, 273 (4th Cir. 2001). We have applied this settled legal principle and carefully assessed the trial record on the sufficiency of evidence contentions, as summarized in the Opinion. *See supra* Part I.B. Premised on this assessment, we agree with the district court's analysis of the evidence sufficiency contentions, as spelled out in its Opinion and summarized herein. We therefore affirm its rejection of the Defendants' evidence sufficiency challenges.

## III.

The Defendants also challenge their sentences on several grounds. Most compellingly, they contend that the district court erred in setting their offense levels under the Sentencing Guidelines by (1) miscalculating the applicable fraud-loss amount, and (2) penalizing them for substantially jeopardizing the safety and soundness of a financial institution. We assess these issues in turn.

## A.

First, the Defendants contend that the district court miscalculated the fraud-loss amount under section 2B1.1(b) of the Guidelines, which erroneously resulted in a seventeen-level increase to their offense levels. The Defendants seek to limit the amount of loss used for sentencing purposes to what was, in their view, reasonably foreseeable.[20] We review de novo a district court's interpretation of what

---

[20]The Defendants derive this foreseeability language from commentary to the 2005 edition of the Guidelines, defining "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG § 2B1.1 cmt. n.3 (2005). The Defendants have, however, erroneously relied on the 2005 edition of the Guidelines. The PSRs calculated the Defendants' recommended sentences based on the 2000 edition, and the district court largely adopted the PSRs' recommendations. Although we review the Defendants' sentences under the 2000 edition, which does not contain this same language, we nevertheless consider the Defendants' foreseeability contention and find it unpersuasive.

constitutes a "loss" under the Guidelines, while accepting its loss calculation in the absence of clear error. *United States v. Allen*, 491 F.3d 178, 193 (4th Cir. 2007). Pursuant to section 2B1.1 cmt. n.2, "loss" is the value of the property taken, damaged, or destroyed. In calculating loss, section 2B1.1 cmt. n.3 provides, in pertinent part, that "the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." Here, the court determined that the PSRs had accurately calculated the applicable loss to be greater than $10 million.

The Defendants contend, however, that the extent of the loss resulting from their offenses was largely unforeseeable. Their primary basis for this contention is that the loss suffered by Fleet was unforseeable because it was actually caused by Burruss's decision to file bankruptcy.[21] In contrast, the prosecution contends that Burruss's bankruptcy and Fleet's loss were foreseeable because the Defendants' criminal activities drove Burruss into bankruptcy and deprived Fleet of its collateral.

We are unable to accept the Defendants' assertion that Burruss's decision to file for bankruptcy resulted in an unforseeable loss. As the jury found, it was the Defendants' criminal activities and their mismanagement of Burruss that drove Burruss into bankruptcy and deprived Fleet of its collateral. As a result, the district court did not err in its findings on the fraud-loss amount.

### B.

Next, the Defendants contend that the district court erred in increasing their offense levels, pursuant to section 2B1.1(b)(6)(A) of the Guidelines, on the premise that they substantially jeopardized the safety and soundness of a financial institution (namely, the Company, Union, and Health Plans). They argue, in this regard, that Burruss did not qualify as a "large corporation" under the Guidelines; the ERISA plans in question were not terminated by Jackson's actions, but rather

---

[21]Jackson was hospitalized on October 12, 2000, and had open-heart surgery on October 13, 2000. During his hospitalization and recuperation, Wilson discovered that Burruss's assets had been inflated and hired O'Halloran to run the company. Incredibly, the Defendants contend that Jackson's absence also led to unforseeable losses to Fleet.

by the new Plan Administrators; and that the Plans were not jeopardized because, as a result of a settlement in a related civil suit, Jackson surrendered his individual account to reimburse the Plans. The prosecution contends that the Defendants' "large corporation" argument is undercut by the $1.4 million loss suffered by the ERISA Plans, plus the fact that the Plans were jeopardized when the Defendants stole their assets in 1999 to 2000. Finally, the prosecution contends that the Defendants' argument that they did not terminate the Plans lacks merit because their criminal activities forced Burruss into bankruptcy, thus causing the terminations.

The Defendants present no authority to support their claim that Burruss did not qualify as a "large corporation." The Defendants derive their "large corporation" assertion from Guidelines section 2B1.1 cmt. n.8, which provides, in pertinent part:

> "Union or employee pension fund" and "any health, medical, or hospital insurance association," as used [in defining a financial institution], primarily include large pension funds that serve many individuals (e.g., pension funds of large national and international organizations, unions, and corporations doing substantial interstate business), and associations that undertake to provide pension, disability, or other benefits (e.g., medical or hospitalization insurance) to large numbers of persons.

Unfortunately for the Defendants, the evidence satisfies this Guidelines provision. The Funds in this case served over half of Burruss's 1200 to 1400 employees and operated in multiple states, providing medical and retirement benefits to both union and non-union employees. And, the moneys and assets the Defendants embezzled from the Plans amounted to approximately $1.4 million over a two-year period. Finally, the Guidelines do not specify the "size" that a corporation must be before its ERISA plan qualifies as a "financial institution."

The Defendants' contention that the Plans were not jeopardized because Jackson reimbursed them also lacks merit. The Plans were jeopardized when moneys belonging to them were diverted for the Defendants' self-enrichment. Finally, it is not necessary to the application of this enhancement that the Plans be terminated: it is only nec-

essary that the Plans be placed in "jeopardy" of termination. *See* USSG § 2B1.1 cmt. n.9.[22] The Plans were, in any event, ultimately terminated because of the Defendants' criminal activities — which drove Burruss into deep financial difficulty and ultimately resulted in its bankruptcy. Consequently, the sentencing court did not err in finding that the Defendants substantially jeopardized the safety and soundness of a financial institution.[23]

---

[22]According to the Guidelines,

> [a]n offense shall be deemed to have "substantially jeopardized the safety and soundness of a financial institution" if, as a consequence of the offense, the institution became insolvent; substantially reduced benefits to pensioners or insureds; was unable on demand to refund fully any deposit, payment, or investment; was so depleted of its assets as to be forced to merge with another institution in order to continue active operations; *or was placed in substantial jeopardy of any of the above*.

USSG § 2B1.1 cmt. n.9 (emphasis added).

[23]We are content to summarily reject the Defendants' other sentencing contentions. First, the Defendants assert that the Sentencing Guidelines are unconstitutional because sentencing enhancements may be imposed on the basis of non-jury factual findings, and mitigating character evidence does not reduce a defendant's Guidelines sentence. The Supreme Court has determined however, that the Sixth Amendment is not violated by an advisory Guidelines regime. *See United States v. Booker*, 543 U.S. 220, 233, 265 (2005). In any event, the district court properly considered mitigating character evidence, albeit with respect to the 18 U.S.C. § 3553(a) factors, rather than the Guidelines. Finally, the Defendants maintain that the district court erroneously applied a "presumption of reasonableness" to sentences within the applicable Guidelines ranges. Although the Defendants are correct that a district court is not entitled to apply such a presumption, *see United States v. Battle*, 499 F.3d 314, 322 (4th Cir. 2007), there is no indication that the district court did so in this case.

IV.

Pursuant to the foregoing, we affirm Jackson's and Carey's convictions and sentences.

*AFFIRMED*